# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **MARGARITO CASTAÑON NAVA**, *et al.* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Case No. 18 C 3757** |
| | ) | |
| **DEPARTMENT OF HOMELAND** | ) | **Judge Rebecca R. Pallmeyer** |
| **SECURITY,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Five Individual Plaintiffs (Margarito Castañon Nava, John Doe, Miguel Cortes Torres, Guillermo Hernandez Hernandez, and Erick Rivera Sales) and two Organizational Plaintiffs (the Illinois Coalition for Immigrant and Refugee Rights and Organized Communities Against Deportations) filed this putative class action to ensure that Defendant U.S. Immigration and Customs Enforcement (ICE) "complies with its clear statutory obligations under 8 U.S.C. § 1357(a)(2) when conducting warrantless arrests." (Second Am. Compl. [58] ¶ 1.)[1] Plaintiffs Nava, Hernandez, and Sales also seek, on behalf of a proposed sub-class, to ensure that ICE complies with the Fourth Amendment when making traffic stops. Before the court is Defendants' motion to dismiss the Second Amended Complaint for lack of jurisdiction or, in the alternative, for failure to state a claim. For the following reasons, Defendants' motion is denied.

## BACKGROUND

The court takes the following facts from the allegations in Plaintiffs' Second Amended

---

[1]     In addition to ICE, Defendants are the U.S. Department of Homeland Security (DHS), Acting DHS Secretary Kevin McAleenan, Acting ICE Director Ronald D. Vitiello, and Field Office Director of the ICE Chicago Field Office Ricardo Wong. (On April 11, 2019, pursuant to Federal Rule of Civil Procedure 25(d), Plaintiffs substituted Acting DHS Secretary McAleenan for former DHS Secretary Kirstjen Nielsen. (*See* Pls.' Opp. to Defs.' Mot. to Dismiss ("Pls.' Opp.") [74], 1 n.1.) On December 18, 2018, pursuant to Federal Rule of Civil Procedure 25(d), Plaintiffs substituted Acting ICE Director Vitiello for former Acting ICE Director Thomas D. Homan. (*See* Second Am. Compl. n.1.).)

Complaint.

Defendant DHS is responsible for enforcing federal laws governing border control, customs, trade, and immigration. (Second Am. Compl. ¶ 24.) Defendant ICE is the component of DHS charged with enforcing federal immigration law. (*Id.* ¶ 25.) Under the Immigration and Nationality Act (INA), immigration officials may conduct warrantless arrests, but only if the officials have "reason to believe" that the potential arrestee (1) "is in the United States in violation of [an immigration] law or regulation" *and* (2) "is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2). Courts equate "reason to believe" under the INA with probable cause. *See, e.g.*, *United States v. Cantu*, 519 F.2d 494, 496 (7th Cir. 1975); *Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1007 (N.D. Ill. 2016) ("[T]he phrase 'reason to believe' in § 1357(a)(2) requires the equivalent of probable cause, *see Cantu*, 519 F.2d at 496, which in turn requires a particularized inquiry.").

Plaintiffs allege that "[i]n recent months, ICE has been conducting indiscriminate, large-scale immigration sweeps, principally targeting states and localities that have adopted so-called 'sanctuary laws,' which limit state and local participation in civil immigration enforcement." (Second Am. Compl. ¶ 29.) This lawsuit arises from a large-scale ICE enforcement action that occurred in the Chicago area during a week-long period in May 2018. (*Id.* ¶ 32.) Plaintiffs allege that ICE arrested 156 people during that time. (*Id.*) They further allege that by ICE's own account, 106 of the arrests were "at-large collateral arrests"—meaning "arrests of individuals for whom ICE lack[ed] an arrest warrant." (*Id.* ¶¶ 4, 32 (internal quotation marks omitted).) According to the Second Amended Complaint, the collateral arrests included those of the Individual Plaintiffs in this action, all of whom have lived in the Chicago area for at least four and as many as thirty years. (*See id.* ¶¶ 5, 8, 17-21.) Plaintiffs allege that ICE arrested and detained each Individual Plaintiff "without a warrant or an individualized determination that he is a flight risk," in violation of 8 U.S.C. § 1357(a)(2). (*Id.* ¶¶ 17-21.) They allege, further, that ICE's actions reflect a widespread policy and practice of violating the INA in this manner.

In Count I of the Second Amended Complaint, Plaintiffs assert a claim for violations of the Administrative Procedure Act (APA), 5 U.S.C. §§ 101-913, which governs the conduct of federal administrative agencies.  Specifically, Plaintiffs allege that "ICE's policy and practice of making warrantless arrests without the required individualized flight risk analysis is 'final agency action' that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (Second Am. Compl. ¶ 97 (quoting 5 U.S.C. §§ 704, 706(2)(A)).  Plaintiffs also allege that the same policy and practice is "'final agency action' that is 'in excess of statutory jurisdiction, authority, or limitations' under § 1357(a)(2)."  (Second Am. Compl. ¶ 98 (quoting 5 U.S.C. §§ 704, 706(2)(C)).)

In addition to their APA claim, Plaintiffs assert a claim under the Fourth Amendment of the U.S. Constitution.  (*See* Second Am. Compl., Count II.)  This claim is based on ICE's traffic stops of four Individual Plaintiffs, which ultimately led to their arrests and detention.  (*See id.* ¶¶ 37, 42, 47, 52, 101-113.)[2]  Plaintiffs allege that ICE officers have authority to stop a vehicle only if they have "reasonable suspicion of an immigration violation" by a driver or passenger.  (*Id.* ¶¶ 73-75 (citing 8 U.S.C. §§ 1357(a)(4), (a)(5), which describe circumstances in which ICE officials can make criminal arrests and do not "include the authority to issue traffic citations").)  According to the Second Amended Complaint, ICE officers stopped the Individual Plaintiffs without reasonable suspicion that they, or any other individuals in the vehicles, had violated an immigration law.  (*See, e.g.*, *id.* ¶¶ 104, 106, 108.)  Plaintiffs allege, further, that the ICE officers stopped the Individual Plaintiffs' vehicles merely because the drivers and passengers therein appeared to be Hispanic. (*See, e.g.*, *id.* ¶¶ 9, 104, 108.)  And Plaintiffs allege that ICE's actions reflect a policy and practice of violating the Fourth Amendment while conducting traffic stops.  (*See id.* ¶¶ 109-110.)

As indicated above, Plaintiffs in this action include not only five individuals, but also two

_____

[2]    ICE officers stopped the fifth Individual Plaintiff while he was walking down a sidewalk.  (*See id.* ¶ 9.)

3

organizations: the Illinois Coalition for Immigrant and Refugee Rights (ICIRR) and Organized Communities Against Deportations (OCAD). ICIRR is a nonprofit, statewide organization "dedicated to promoting the rights of immigrants and refugees to full and equal participation" in "civic, cultural, social, and political life." (Second Am. Compl. ¶ 22.) Its work includes "educat[ing] and organiz[ing] immigrant and refugee communities to assert their rights; promot[ing] citizenship and civic participation; monitor[ing], analyz[ing], and advocat[ing] on immigrant-related issues; provid[ing] support and information during times of crisis; and educat[ing] the public about the contributions of immigrants and refugees." (*Id.*) OCAD, too, is a nonprofit organization. (*Id.* ¶ 23.) It "organizes against deportations, detention, criminalization, and incarceration, of black, brown, and immigrant communities in Chicago." (*Id.*) Among other things, OCAD participates in "grassroots organizing, legal and policy work, [and] direct action" to "defend its communities, challenge the institutions that target and dehumanize them," and help "its communities thrive, work, and organize with happiness and without fear." (*Id.*) Like ICIRR, OCAD "provid[es] information and education about [community members'] rights and provid[es] support during times of crisis." (*Id.*)

ICIRR and OCAD (hereinafter, the Organizational Plaintiffs) allege that they "have had to divert considerable, additional resources to" counteract the effects of Defendants' allegedly illegal actions. (*Id.* ¶¶ 94, 112; *see also id.* ¶¶ 6, 72.) For example, according to the Second Amended Complaint, a telephone hotline that the Organizational Plaintiffs operate jointly "has experienced nearly a 50% increase in call volume from those seeking help trying to find loved ones detained by ICE, those seeking information about their rights, and those reporting the increased ICE raids throughout the community." (*Id.* ¶ 72; *see also* June 2018 Decl. of Lawrence Benito, CEO and Executive Director of ICIRR, Ex. D to Second. Am. Compl. ("Benito Decl.") [58-5], ¶ 12 ("In the last month alone we have received 836 inbound calls, which is an increase of almost 50% over the previous month when no raids were reported."); June 2018 Decl. of Xanat Sobrevilla, Co-Founder of OCAD, Ex. E to Second Am. Compl. ("Sobrevilla Decl.") [58-6] ¶¶ 7-9 (stating that the

marked increase in calls to the hotline began on May 19, 2018).)  Plaintiffs allege that to answer the calls and provide the support that the callers request, the Organizational Plaintiffs have had to "hire and train new staff," give additional "Know Your Rights" presentations, and "develop other strategies to defend the rights of the communities they serve."  (Second Am. Compl. ¶ 72; *see* Benito Decl. ¶ 12 (stating that "historically, the hotline has been staffed by 3 operators from OCAD," but that "as a result of the flood of calls, we have had to pull multiple ICIRR staff members off other duties to deal with call backlogs.  We are also now in the process of trying to train up to 10 more operators, so that we can meet the needs of affected families in light of ICE's escalating enforcement"); Benito Decl. ¶ 13 (stating that ICIRR has received more community requests for "Know Your Rights" programs "[a]s a result of the increase in ICE enforcements," and has had to "expend more personnel time" and "re-work" the programs to meet those needs).)

Plaintiffs further allege that to meet the increased need for services, the Organizational Plaintiffs "have been forced to seek emergency donations from their benefactors," an effort which has imposed additional cost in "time and resources."  (Second Am. Compl. ¶ 72; *see also* Sobrevilla Decl. ¶ 12 (stating that OCAD sought emergency grants to hire additional staff who could answer telephone hotline calls and "follow up with the families"); Benito Decl. ¶ 17 (ICIRR has devoted "[o]ver 20 hours of staff time . . . to preparing grant applications and funding pitches").)  Finally, Plaintiffs allege that "[t]he increased need for [the Organizational Plaintiffs'] services as a result of ICE's tactics has caused [them] to either place a hold on or abandon [their] efforts on other projects and programming . . . ."  (Second Am. Compl. ¶ 72; *see also*, *e.g.*, Sobrevilla Decl. ¶ 12 (stating that OCAD's "staff had to divert their time and resources to answering [hotline] calls instead of focusing on [their] planned work" concerning a "Chicago Gang Database").)

Plaintiffs seek to represent a class (the Main Class) under Federal Rule of Civil Procedure 23(b)(2) comprising "[a]ll current and future persons whom ICE arrests or has arrested without having a warrant, within the area of responsibility of the ICE Chicago Field Office, who remain

detained." (*Id.* ¶ 82.) Plaintiffs Nava, Hernandez, and Sales—each of whom ICE arrested and detained following a traffic stop—also seek to represent a sub-class under Federal Rule of Civil Procedure 23(c)(5) comprising "[a]ll members of the Main Class who were subject to a traffic stop initiated by ICE officers within the area of responsibility of the Chicago Field Office." (*Id.* ¶ 83.) Plaintiffs seek declaratory relief, including an order stating that the challenged conduct violates the INA and the Fourth Amendment; injunctive relief, including orders prohibiting Defendants from engaging in the challenged conduct and requiring them to adopt policies that will ensure they follow the relevant laws; and attorneys' fees and costs. (*See id.*, Prayer for Relief.)

In their briefs on this motion, Defendants report that ICE executed arrest warrants for the Individual Plaintiffs after they took them into custody, and later initiated proceedings to remove each of them from the United States. (Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mot.") [66-1], 4.) ICE ultimately released the Individual Plaintiffs from custody on bond, but Defendants assert that "[n]one of the five named plaintiffs is a citizen or national of the United States, and they are all unlawfully present in the United States." (*Id.*) Plaintiffs do not respond to these contentions. and the court presumes that the Individual Plaintiffs' removal proceedings remain pending.

## DISCUSSION

### A.     Defendants' Rule 12(b)(1) Motion

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the existence of subject matter jurisdiction. *See* FED. R. CIV. P. 12(b)(1). The party invoking federal jurisdiction bears the burden of establishing that jurisdiction is proper. *See Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 691 (7th Cir. 2015); *Schmidt v. Waterstone Bank SSB*, 753 F. App'x 414, 416 (7th Cir. 2019). When a defendant challenges the sufficiency of the allegations concerning subject matter jurisdiction, the court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Remijas*, 794 F.3d at 691; *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443-44 (7th Cir. 2009); *see also Silha*

*v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015) (stating that "when evaluating a facial challenge to subject matter jurisdiction under Rule 12(b)(1), a court should use *Twombly-Iqbal's* 'plausibility' requirement, which is the same standard used to evaluate facial challenges to claims under Rule 12(b)(6)").  If a defendant factually challenges the basis for federal jurisdiction, however, the court "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Apex Digital*, 572 F.3d at 444; *see also id.* (explaining that "a factual challenge lies where the complaint is formally sufficient but the contention is that there is *in fact* no subject matter jurisdiction" (internal quotation marks omitted)).  "When facts relevant to subject-matter jurisdiction are disputed, the plaintiff must establish those facts by a preponderance of the evidence." *Miller v. Fryzel*, 499 F. App'x 601, 603 (7th Cir. 2013); *see also Laurens v. Volvo Cars of N. Am., LLC*, 868 F.3d 622, 625 (7th Cir. 2017) ("If a defendant raises a factual challenge to standing, the plaintiff bears the burden of proving standing by a preponderance of the evidence.").

### 1. Subject Matter Jurisdiction Under 8 U.S.C. § 1252(b)(9)

Defendants argue that Section 1252(b)(9) of the INA, in conjunction with Section 1252(a)(5), deprives this court of jurisdiction over Plaintiffs' claims.  Section 1252(a)(5) provides, in relevant part, that "a petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter."  8 U.S.C. § 1252(a)(5).  Section 1252(b)(9), in turn, provides that "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States . . . shall be available only in judicial review of a final order under this section."  8 U.S.C. § 1252(b)(9).  Defendants effectively characterize Plaintiffs' claims as raising questions of law and fact that arise from actions taken to remove non-citizens.  (*See, e.g.*, Defs.' Mot. 11.)  As a result, Defendants maintain, Plaintiffs can obtain judicial review of their claims only by filing a petition for review of a final removal order with a U.S. court of appeals.

(*See id.* at 8-13.) Plaintiffs, on the other hand, contend that their claims do not fall within Section 1252(b)(9)'s jurisdictional bar because they "challenge ICE's illegal actions that occurred *before* the removal process began." (Pls.' Opp. 5.) For the following reasons, the court concludes that Section 1252(b)(9) does not operate as a jurisdictional bar in this case.

The U.S. Supreme Court recently addressed the jurisdiction-channeling function of Section 1252(b)(9) in *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018). In a three-Justice plurality opinion written by Justice Alito, the Court held that Section 1252(b)(9) did not deprive it of jurisdiction over the plaintiffs' claims that they were entitled to periodic bond hearings while they were detained for removal proceedings. *See id.* at 839-40.[3] Justice Alito stated, first, that the Court would "assume for the sake of argument that the actions taken with respect to all [plaintiffs]," including their detention, "constitute 'action[s] taken . . . to remove [them] from the United States.'" *Id.* at 840 (quoting 8 U.S.C. § 1252(b)(9)). "On that assumption," Justice Alito continued, "the applicability of § 1252(b)(9) turns on whether the legal questions that [the Court] must decide 'aris[e] from' the actions taken to remove" the plaintiffs. *Id.* at 840. He concluded that Section 1252(b)(9) did not strip the Court of jurisdiction because the plaintiffs were not (1) "asking for review of an order of removal"; (2) "challenging the decision to detain them in the first place or to seek removal"; or (3) "challenging any part of the process by which their removability [would] be determined." *Id.* at 841; *see also Nielsen v. Preap*, 139 S. Ct. 954, 961-62 (2019) (three-Justice

---

[3] Chief Justice Roberts and Justice Kennedy joined Justice Alito's opinion. On the merits, the Court reversed the Ninth Circuit's determination that Sections 1225(b), 1226(a), and 1226(c) of the INA "limit the permissible length of an alien's detention without a bond hearing." *Jennings*, 138 S. Ct. at 842. Justices Breyer, Ginsburg, and Sotomayor dissented on the merits but agreed that Section 1252(b)(9) did not deprive the Court of jurisdiction. *See id.* at 876 (Breyer, J., dissenting). Justices Thomas and Gorsuch concurred in part and concurred in the judgment but opined that the Court lacked jurisdiction. *See id.* at 855. And Justice Kagan took no part in deciding the case. A majority of the Court, therefore, agreed that it had jurisdiction in the circumstances presented, but the Court's reasoning was fractured. The dissenting Justices interpreted Section 1252(b)(9) more narrowly than Justice Alito; in their view, the provision applies only when claims seek review of an order of removal under Section 1252(a)(1). *See id.* at 876 (Breyer, J., dissenting).

plurality) (where plaintiffs' claims had these same three characteristics, Section 1252(b)(9) did not deprive the Court of jurisdiction to decide whether "criminal aliens who are not arrested immediately upon release are thereby exempt from mandatory detention under [8 U.S.C. § 1226(c)]").

Justice Alito noted that the Court was not providing a "comprehensive interpretation" of Section 1252(b)(9). *Jennings*, 138 S. Ct. at 841. And he cautioned against reasoning that questions of law and fact "'aris[e] from' actions taken to remove the aliens in the sense that the aliens' injuries would never have occurred if they had not been placed in detention." *Id.* at 840. Such an "expansive" and "extreme" interpretation of Section 1252(b)(9), he stated, would create absurd results—such as "cramming judicial review" of *Bivens* claims "based on allegedly inhumane conditions of confinement" "into the review of final removal orders." *Id.*[4] An overly expansive interpretation of the provision "would also make claims of prolonged detention effectively unreviewable." *Id.* A narrower interpretation of the provision, Justice Alito added, finds support in *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999). There, the Court construed "arising from" in Section 1252(g) of the INA to reference only the "three specific actions" listed in the provision rather than "sweep in any claim that can technically be said to 'arise from'" those three actions. *Jennings*, 138 S. Ct. at 840 (citing *Reno*, 525 U.S. at 482-83).

Justice Thomas would have dismissed the *Jennings* plaintiffs' claims for lack of jurisdiction. *See Jennings*, 138 S. Ct. at 855 (Thomas, J., concurring in part and concurring in the judgment). In his view, Section 1252(b)(9)'s jurisdictional bar applied "because detention *is* an 'action taken . . . to remove' an alien" and "even the narrowest reading of 'arising from' must cover claims that directly challenge such actions." *Id.* at 855 (quoting 8 U.S.C. § 1252(b)(9)).

---

[4] In a *Bivens* action, a plaintiff can file a lawsuit for damages when a person acting under color of federal law allegedly deprived him or her of a constitutionally protected right. *See generally Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971); *see also, e.g.*, *Case v. Milewski*, 327 F.3d 564, 568 (7th Cir. 2003).

Justice Alito's opinion expressly rejected this position, reiterating that "[t]he question is not whether *detention* is an action taken to remove an alien but whether *the legal questions* in this case arise from such an action." *Id.* at 841 n.3. The legal questions that the *Jennings* plaintiffs raised, Justice Alito stated, "are too remote from the actions taken to fall within the scope of § 1252(b)(9)." *Id.*

Defendants argue that Section 1252(b)(9) operates as a jurisdictional bar in this case, first, because "the questions raised by Plaintiffs—whether ICE's arrests violated the Fourth Amendment or INA—challenge 'the decision to detain them in the first place or to seek removal.'" (Defs.' Mot. 11 (quoting *Jennings*, 138 S. Ct. at 841).) Defendants emphasize that Plaintiffs' claims differ from those in *Jennings* because they do not "challeng[e] the procedural rights of detainees or circumstances of detention." (Defs.' Mot. 11 (citing, inter alia, *Aguilar v. U.S. Immigration & Customs Enforcement Chi. Field Office*, 346 F. Supp. 3d 1174, 1184 (N.D. Ill. 2018) (holding that because plaintiffs challenged only "the circumstances of their detention, § 1252(b)(9) [did] not apply")).) Plaintiffs respond that Section 1252(b)(9) does not deprive the court of jurisdiction because Plaintiffs do not "challenge the decision to initiate the removal process" nor any other aspect of removal proceedings. (Pls.' Opp. 5.) "Rather, [they] challenge ICE's illegal actions that occurred *before* the removal process began." (*Id.*) The Seventh Circuit has not yet applied or interpreted the jurisdictional holding in *Jennings*. Based on the authority that is available, however, the court finds Plaintiffs' argument more persuasive.

Plaintiffs allege that ICE made traffic stops based solely on race-based assumptions that drivers and passengers were non-citizens, in violation of the Fourth Amendment. Accepting this allegation as true, the stops were illegal and their purpose was, at best, to investigate whether random individuals were removable, when it was equally likely that they were U.S. citizens. An illegal stop conducted before the government has any legitimate reason to believe that the subject is removable cannot be an "action taken . . . to remove *an alien . . . under*" the INA. 8 U.S.C. § 1252(b)(9) (emphasis added). Plaintiffs also allege that ICE violated Section 1357(a)(2)

of the INA when it effectuated warrantless arrests without conducting the statutorily required flight-risk analysis. This claim constitutes a challenge to conduct that, Plaintiffs assert, exceeds the bounds of what Congress authorized under the INA. Significantly, in *Jennings*, the Court's discussion of detention as an action taken to remove a non-citizen appears to have contemplated *lawful* detention. *See Jennings*, 138 S. Ct. at 854, 855 (Thomas, J., concurring in part and concurring in the judgment) (stating that "detention during removal proceedings" is "congressionally authorized" and that "[t]he phrase 'any action taken . . . to remove an alien from the United States' must at least cover congressionally authorized portions of the deportation process that necessarily serve the purpose of ensuring an alien's removal" (quoting 8 U.S.C. § 1252(b)(9))); *id.* at 841 n.3 (Alito, J.) (assuming, for the sake of argument, that detention is an action taken to remove a non-citizen for purposes of Section 1252(b)(9)). Crediting Plaintiffs' allegation that ICE detained them in violation of the INA, their challenge is not to congressionally-authorized action taken for the purpose of removal, and Section 1252(b)(9) therefore does not operate as a jurisdictional bar. *See Tun-Cos v. Perrotte*, No. 1:17-cv-943 (AJT/TCB), 2018 WL 3616863, at *6 (E.D. Va. Apr. 5, 2018) (Section 1252(b)(9) did not bar jurisdiction over plaintiffs' Fourth and Fifth Amendment claims based on illegal targeting, stopping, and searching, including because the claims challenged actions that were not lawfully aimed at ensuring removal), *rev'd and remanded on other grounds*, 922 F.3d 514 (4th Cir. 2019).

Even assuming that the stops and detentions in this case were actions taken to remove Plaintiffs from the United States under the INA, the factual and legal questions that Plaintiffs raise are, as Plaintiffs contend, "collateral to the removal process." (Pls.' Opp. 9.) That is, they "are too remote from" removal actions "to fall within the scope of § 1252(b)(9)," and therefore do not "arise from" them. *Jennings*, 138 S. Ct. at 841 n.3. Defendants resist this conclusion, arguing that Plaintiffs' claims "require an assessment of ICE's evidence of removability for each individual." (Defs.' Reply [75], 3; *see also id.* at 3 & n.4 (arguing that because Plaintiffs do not "challenge ICE's statutory authority generally," but instead "allege that ICE exceeded its authority

in specific individuals' cases," the claims "require a case-by-case analysis as to the basis for ICE's reason to believe that each named plaintiff was present in the United States in violation of the law at the time of his or her arrest").) As already discussed, however, Plaintiffs' Fourth Amendment claim concerns conduct by ICE officers that allegedly occurred before they had any reason to believe that the Individual Plaintiffs had violated an immigration law, and before the government had initiated removal proceedings against them. In these circumstances, the question whether ICE's alleged racial profiling violated Plaintiffs' Fourth Amendment rights cannot be said to have a close relation to removal proceedings, and "cramming judicial review" of that question into an appellate court's review of a final removal order "would be absurd." *Jennings*, 138 S. Ct. at 840. Similarly, Plaintiffs claim that ICE violated the INA by failing to make particularized determinations that the Individual Plaintiffs were "likely to escape before a warrant [could] be obtained" for their arrests. 8 U.S.C. § 1357(a)(2). The prescribed particularized determination of a detainee's flight risk is not substantively related to the question whether a non-citizen can lawfully be removed from the United States. Rather, Plaintiffs' INA-based claim raises questions of law and fact that are quite remote from the issue of the Individual Plaintiffs' removability. Section 1252(b)(9), therefore, does not deprive the court of jurisdiction.

The rationale of *Torres-Tristan v. Holder*, 656 F.3d 653 (7th Cir. 2011), supports this conclusion. There, the Seventh Circuit held that it lacked jurisdiction under 8 U.S.C. § 1252(a)(1) and (a)(5) to review orders by U.S. Citizenship and Immigration Services denying the petitioner's request for U-Visas and waivers of inadmissibility. *Id.* at 655. In discussing the contours of its jurisdiction to review "a final order of removal" under Sections 1252(a)(1) and (a)(5), the Seventh Circuit stated that "[a]ncillary determinations made outside the context of a removal proceeding . . . are not subject to direct review." *Id.* at 658. Although the Seventh Circuit was interpreting provisions that grant rather than limit jurisdiction, this statement has direct implications for Section 1252(b)(9). Namely, if a court of appeals may not make "ancillary determinations" on direct review of a final removal order, then it makes little sense for Section 1252(b)(9) to deprive

district courts of jurisdiction over such determinations. *See, e.g.*, *Immigration & Naturalization Serv. v. St. Cyr*, 533 U.S. 289, 313 (2001) (stating that the purpose of Section 1252(b)(9) "is to consolidate judicial review of immigration proceedings into one action in the court of appeals" (internal quotation marks omitted)). Moreover, the Seventh Circuit implied in dicta that Section 1252(b)(9)'s jurisdictional bar applies whenever a claim is "inextricabl[y] link[ed]" to a removal order, but not when it is collateral to such an order. *See Torres-Tristan*, 656 F.3d at 662. Defendants themselves cite a Ninth Circuit case—which relies on *Torres-Tristan*—for this very proposition. (*See* Defs.' Mot. 8 & n.3 (citing *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1032 (9th Cir. 2016)).) Here, Plaintiffs' claims are collateral to, not inextricably intertwined with, a removal order.

Defendants contend that just three types of claims are truly "collateral" to the removal process: claims for ineffective assistance of counsel based on conduct that occurs after a final order of removal is issued; claims for "unconstitutionally prolonged detention"; and "certain claims challenging bond procedures." (Defs.' Mot. 8-9 n.3 (stating that the Ninth Circuit has recognized only these types of "collateral" claims).) The statute itself does not delineate what is "collateral," however, and in reversing the Ninth Circuit in *Jennings*, Justice Alito expressly left the question of Section 1252(b)(9)'s scope to another day. *See Jennings*, 138 S. Ct. at 841 (stating that the Court was not "attempt[ing] to provide a comprehensive interpretation" of the circumstances under which the provision removes jurisdiction).

Plaintiffs also cite, in addition to *Torres-Tristan*, two district court cases that are more directly on point. Although the cases are not binding on this court, their conclusions regarding the court's jurisdiction over claims similar to Plaintiffs' are instructive. The first case, *Roy v. County of Los Angeles*, involved claims concerning immigration detainers. No. CV 12-09012-AB (FFMx), 2018 WL 914773, at *2 (C.D. Cal. Feb. 7, 2018). Immigration detainers are requests that ICE issues "to federal, state, and local law enforcement agencies," asking those agencies to keep a detained individual in custody for "up to 48 hours beyond the time he or she would otherwise be released" so that ICE can "assume custody." *Id.* The plaintiffs in *Roy* alleged, among other

13

things, that ICE violates the Fourth Amendment by issuing detainers "based solely upon the use of . . . electronic databases" that "are inaccurate and incomplete." *Id.* at *16. They also alleged that "ICE's practice of issuing detainers without making any assessment of flight risk violates" Section 1357(a)(2) of the INA. *Id.* Before *Jennings* was decided, the court determined that these claims did not "arise from" removal proceedings, and jurisdiction was not lacking, because the plaintiffs "were not subject to ongoing removal proceedings *at the time* that ICE issued detainers against them, and the detainers were not based upon a final order of removal signed by a judge." *Id.* at *18 (emphasis added). Defendants moved for reconsideration of this issue in light of *Jennings*, but the district court denied the request, noting the language in *Jennings* discouraging an expansive interpretation of "arising from." *See Roy*, No. CV 12-09012-AB (FFMx), slip op. at 8-9 (C.D. Cal. Apr. 18, 2018). In the second case Plaintiffs cite, also pre-*Jennings*, the plaintiff challenged "ICE officers' actions in connection with his arrest, initial detention, and four-hour interrogation"—actions the officers allegedly took even after they learned that the plaintiff was a DACA beneficiary and thus could not "be arbitrarily arrested and detained because of [his] immigration status." *Medina v. U.S. Dep't of Homeland Sec.*, No. C17-218-RSM-JPD, 2017 WL 2954719, at *1, *15 (W.D. Wash. Mar. 14, 2017).[5] The plaintiff also alleged "that in arresting him and then interrogating him after confirming that he was a DACA beneficiary, the ICE officers were motivated by racial animus and false assumptions." *Id.* at *15. The court determined that "[n]one of these constitutional claims challenge the removal process or a final order of removal," and thus that it had jurisdiction over them. *Id.*

Like the plaintiffs in *Roy* and *Medina*, Plaintiffs here challenge the allegedly illegal means through which ICE arrested and detained them before the government had initiated removal proceedings. Defendants make no mention of *Roy* or *Medina*. Instead, they point to *Cancino-Castellar v. Nielsen*, 338 F. Supp. 3d 1107 (S.D. Cal. 2018), where the court determined that it

---

[5] DACA, or Deferred Action for Childhood Arrivals, is a U.S. immigration policy announced in 2012. *See id.* at *1-2.

lacked jurisdiction under Section 1252(b)(9) to decide whether the Fourth Amendment "permit[s] the Government to detain individuals without prompt judicial determination of whether probable cause justifies their detention." *Id.* at 1115-16 (internal quotation marks omitted). *Cancino-Castellar* does not directly support Defendants' position because in that case, the plaintiffs sought "a procedural safeguard by which [their] removability . . . [would be] immediately reviewable by an [immigration judge]." *Id.* at 1116 (internal quotation marks omitted). Here, Plaintiffs are not challenging any aspect of their removability and are not arguing for an institutional safeguard not called for by statute. (*See* Pls.' Opp. 5.)

Separately, Defendants argue that Section 1252(b)(9) operates as a jurisdictional bar because the issues Plaintiffs raise "are cognizable in a petition for review at the end of removal proceedings." (Defs.' Mot. 11 (citing *Cancino-Castellar*, 338 F. Supp. 3d at 1114); *see also* Defs.' Mot. 12 (arguing that "challenges to the lawfulness of ICE's actions in an arrest are routinely raised in removal proceedings and reviewed by courts in conjunction with a petition for review of a final order of removal").) Whatever the availability of review in that context, it does not satisfy Plaintiffs' concerns here because the government will not necessarily enter final removal orders against each of the Individual Plaintiffs in this action. Moreover, the government will not necessarily even initiate removal proceedings against every individual that Defendants arrest and detain pursuant to the policies and practices that Plaintiffs challenge. In either scenario, Plaintiffs would have no opportunity to bring their claims in any forum. Defendants contend that the latter scenario "is irrelevant because it describes a hypothetical situation not covered by Plaintiffs' allegations." (Defs.' Reply 4 n.5.) Viewed in the light most favorable to Plaintiffs, however, the allegations permit an inference that ICE's alleged practices will likely cause at least some U.S. citizens (or lawful permanent residents) to be stopped and/or detained. Those individuals fall within the proposed class definitions, and the government would not commence removal proceedings against them. The risk that Section 1252(b)(9) would operate in this case to completely bar, rather than merely channel, certain Plaintiffs' claims is therefore real. And as

Justice Alito suggested in *Jennings*, courts should be reluctant to apply Section 1252(b)(9) when it would have this effect. *See Jennings*, 138 S. Ct. at 840 (cautioning against an "expansive" interpretation of "arising from" because it could make claims "effectively unreviewable," and recognizing the possibility that a final order of removal might never "be entered in a particular case," thus "depriving that detainee of any meaningful chance for judicial review"). Here, the risk that certain Plaintiffs could be precluded from presenting their claims in any forum weighs in favor of a finding that Section 1252(b)(9) does not deprive the court of jurisdiction.

Plaintiffs, moreover, argue that even if they could raise their claims in proceedings challenging a final removal order, they would not have a meaningful opportunity to obtain the relief they seek—specifically, "declarations that ICE violates the constitution and the INA, and injunctions to prohibit further unconstitutional stops and improper arrests and require ICE to adopt policies that comply with its legal obligations." (Pls.' Opp. 12.) Defendants cite several cases in which immigration courts, or appellate courts adjudicating challenges to final removal orders, considered challenges to ICE's arrest- and detention-related conduct; the availability of those forums, Defendants suggest, militate against a finding that the court has jurisdiction. (*See* Defs.' Mot. 12; Defs.' Reply 4.) But the plaintiffs in every one of those cases challenged ICE's conduct as a means to suppress evidence concerning their removability. *See Immigration & Naturalization Serv. v. Lopez-Mendoza*, 468 U.S. 1032, 1034 (1984); *Sanchez v. Sessions*, 885 F.3d 782, 786 (4th Cir. 2018); *Slavov v. Holder*, 501 F. App'x 551, 554-55 (7th Cir. 2013); *Oliva-Ramos v. Attorney Gen. of U.S.*, 694 F.3d 259, 264, 274 (3d Cir. 2012); *Gutierrez-Berdin v. Holder*, 618 F.3d 647, 652-53 (7th Cir. 2010); *Martinez Camargo v. Immigration & Naturalization Serv.*, 282 F.3d 487, 489-90, 492-93 (7th Cir. 2002); *Matter of Toro*, 17 I. & N. Dec. 340, 341-43 (BIA 1980). As already noted, Plaintiffs in this case do not challenge their removability. If anything, Defendants' cited cases reinforce the concept that removal proceedings have a singular focus— removability—and are not structured to provide declaratory and injunctive relief aimed at system-wide reforms. *See, e.g.*, *Lopez-Mendoza*, 468 U.S. at 1040 ("[A] deportation hearing is intended

to provide a streamlined determination of eligibility to remain in this country, nothing more."); *see also Aguilar v. U.S. Immigration & Customs Enforcement*, 510 F.3d 1, 11 (1st Cir. 2007) ("[R]emoval proceedings are confined to determining whether a particular alien should be deported.")

For the foregoing reasons, the court concludes that Section 1252(b)(9) does not deprive it of jurisdiction to adjudicate Plaintiffs' claims.

### 2.    Subject Matter Jurisdiction Under 8 U.S.C. § 1252(g)

Defendants next argue that Section 1252(g) of the INA deprives the court of subject matter jurisdiction.  Section 1252(g) provides, with certain exceptions not applicable here, that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."  8 U.S.C. § 1252(g).  According to Defendants, Section 1252(g) applies here because Plaintiffs "challenge aspects of ICE's decision to arrest them in order to commence removal proceedings against them."  (Defs.' Mot. 14.) *Jennings* appears to defeat this argument as well; Justice Alito cautioned that courts should *not* interpret Section 1252(g) "to sweep in any claim that can technically be said to 'arise from' the three listed actions of the Attorney General," but rather should "read the language to refer to just those three specific actions themselves."  *Jennings*, 138 S. Ct. at 841; *see Reno*, 525 U.S. at 482 ("There are of course many other decisions or actions that may be part of the deportation process," such as a "decision[] to open an investigation" or "surveil the suspected violator," but "[i]t is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings").  Relatedly, the Supreme Court has stated that "Section 1252(g) was directed against a particular evil:  attempts to impose judicial constraints upon prosecutorial discretion."  *Reno*, 525 U.S. at 485 n.9.

In this case, Plaintiffs challenge "ICE's actions and policies—or lack thereof—regarding the manner in which it stopped and arrested Plaintiffs."  (Pls.' Opp. 13.)  This conduct "occurred

well before" the government decided to initiate removal proceedings against Plaintiffs (*id.*), and therefore does not arise from the prosecutorial decisions listed in Section 1252(g). The cases Defendants cite in support of its contrary position do not change the court's conclusion because each of those cases, unlike this one, constituted a challenge to a final removal order. *See Hamama v. Adducci*, 912 F.3d 869, 872-73 (6th Cir. 2018); *Sharif ex rel. Sharif v. Ashcroft*, 280 F.3d 786, 787 (7th Cir. 2002); *Botezatu v. Immigration & Naturalization Serv.*, 195 F.3d 311, 313 (7th Cir. 1999); *cf. Silva v. United States*, 866 F.3d 938, 939 (8th Cir. 2017) (action "seek[ing] compensation for harm allegedly arising from an unlawful removal"). The claims in these cases therefore arose from at least one of the prosecutorial decisions specifically mentioned in Section 1252(g): the execution of a removal order. *See, e.g.*, *Sharif*, 280 F.3d at 787 (plaintiffs' request for writ of habeas corpus "that would stop the INS from implementing . . . removal orders," even if construed as a request for stay of removal, arose from the Attorney General's decision "to execute a removal order," and the district court properly concluded that it lacked jurisdiction under Section 1252(g)). Section 1252(g) does not strip the court of jurisdiction over Plaintiffs' claims here, which do not challenge the government's decision to "commence proceedings, adjudicate cases, or execute removal orders" against any alien." 8 U.S.C. § 1252(g).[6]

### 3. Administrative Procedure Act

Plaintiffs bring their INA-based claim under the Administrative Procedure Act, which provides for judicial review of all "final agency action for which there is no other adequate remedy in a court," *id.* § 704, except when "statutes preclude judicial review" or the "agency action is committed to agency discretion by law," *id.* § 701(a). Where judicial review is available, the APA permits a court to "hold unlawful and set aside agency action . . . found to be arbitrary, capricious,

---

[6] In a footnote, Defendants argue that the court "lacks jurisdiction to grant class-wide injunctive relief pursuant to 8 U.S.C. § 1252(f)(1)." (Defs.' Mot. 14-15 n.5.) Because the court has not determined whether it can properly grant class certification in this case, the court need not address this issue here.

an abuse of discretion, or otherwise not in accordance with law," or agency action that is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §§ 706(2)(A), (C).

Defendants argue that the court lacks jurisdiction to hear Plaintiffs' APA claim because, according to Defendants, "the INA precludes . . . judicial review." (Defs.' Mot. 19.) For reasons already explained, however, the court has concluded that the INA does *not* preclude judicial review. Defendants next contend that the court lacks jurisdiction under the APA because by Defendants' account, the agency actions at issue are not "final" and "Plaintiffs have an adequate remedy in immigration court." (Defs.' Mot. 19-20.) This argument falls flat as well because the requirements set forth in Section 704 of the APA are not jurisdictional. *See Matushkina v. Nielsen*, 877 F.3d 289, 292 n.1 (7th Cir. 2017); *see also Dhakal v. Sessions*, 895 F.3d 532, 538 n.9 (7th Cir. 2018) ("[B]ecause the APA is not a jurisdiction-conferring statute, [the] elements of a claim under the APA . . . are not jurisdictional." (quoting *Haines v. Fed. Motor Carrier Safety Admin.*, 814 F.3d 417, 424 (6th Cir. 2016)). Defendants advance these same arguments in moving to dismiss Plaintiffs' APA claim under Rule 12(b)(6), and the court addresses them later in this opinion.

### 4. Organizational Standing

Defendants move to dismiss the Organizational Plaintiffs' claims under Rule 12(b)(1) for lack of standing. Standing "is an essential and unchanging part of the case-or-controversy requirement of Article III" of the United States Constitution. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Here, the Organizational Plaintiffs assert standing on their own behalf rather than representational standing to sue on behalf of their members. (*See* Pls.' Opp. 15). "To bring suit in its own right, an organization must itself satisfy the requirements of standing." *Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of City of Milwaukee*, 708 F.3d 921, 926 (7th Cir. 2013); *see also, e.g.*, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982) ("In determining whether [an organization] has standing under the Fair Housing Act, we conduct the same inquiry as in the case of an individual."). Accordingly, the Organizational Plaintiffs must

allege that (1) they have suffered or will suffer a concrete and particularized injury that is actual or imminent; (2) the injury is fairly traceable to the Defendants' actions; and (3) it is likely that the injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61; *see also, e.g.*, *Common Cause Ind. v. Lawson*, 937 F.3d 944, 949 (7th Cir. 2019).

The Organizational Plaintiffs contend that they have established standing with "well-pleaded facts showing that [they were] forced to divert organizational resources in response to [Defendants'] unlawful practices." (Pls.' Opp. 15.) As previously noted, they allege that Defendants' practices caused a near-50 percent increase in calls to their telephone hotline from individuals seeking information and assistance concerning ICE's large-scale enforcement actions in the Chicago area. (*See, e.g.*, Second Am. Compl. ¶ 72; Benito Decl. ¶ 12; Sobrevilla Decl. ¶¶ 7-9.) According to the Organizational Plaintiffs, the influx of calls forced them to "pull multiple . . . staff members off other duties," hire new staff, revise and give additional "Know Your Rights" presentations, and raise extra funds to pay for these efforts. (*See* Benito Decl. ¶¶ 12-13; Second Am. Compl. ¶ 72.) The Organizational Plaintiffs also allege that to complete this extra work, they had to postpone or abandon other programs. (*See* Second Am. Compl. ¶ 72; Sobrevilla Decl. ¶ 12; *see also* Pls.' Opp. 16-17 (arguing that the "strain on [the Organizational Plaintiffs'] resources to counteract the effects of ICE's unlawful raids has perceptibly impaired [their] counseling services for their communities").)

In advancing their diversion-of-resources theory, the Organizational Plaintiffs rely on the Supreme Court's decision concerning organizational standing in *Havens*, 455 U.S. at 379. One of the plaintiffs in that case was a non-profit organization that advocated for "equal opportunity in housing." *Id.* at 368. Its "activities included the operation of a housing counseling service, and the investigation and referral of complaints concerning housing discrimination." *Id.* The organization sued a realty corporation under the Fair Housing Act for allegedly "steering" prospective African-American renters away from their apartment buildings. *See id.* at 368-69. According to the organization, it suffered an actual injury because the defendant's practices

allegedly "frustrated [its] counseling and referral services, with a consequent drain on resources." *Id.* at 369. The Supreme Court agreed. *See id.* at 379. If the alleged steering practices "have perceptibly impaired HOME's ability to provide counseling and referral services," the Court stated, "there can be no question that the organization has suffered injury in fact." *Id.* The Court explained that "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id.*

Defendants contend that the Organizational Plaintiffs have not alleged a concrete and particularized injury because, in Defendants' view, the practices Plaintiffs challenge "do not frustrate [the Organizational Plaintiffs'] missions, but rather permit [them] to pursue, if not fulfill their purpose[s]." (Defs.' Mot. 18; *see also id.* (emphasizing that the Organizational Plaintiffs' self-described purposes include "providing support and information during times of crisis," "advocat[ing] for policies that protect immigrant families from deportation," and "organiz[ing] against deportations" (quoting Second Am. Compl. ¶¶ 22-23)).) In this vein, Defendants contend that the public used the telephone hotline "as it was designed and intended," and argue that the uptick in calls and its toll on resources do not constitute an injury-in-fact. (Defs.' Reply 6-7.) Rather, Defendants argue, the Organizational Plaintiffs have alleged only an abstract interest in a problem, which is insufficient to confer standing. (*See* Defs.' Mot. 16-17; *Havens*, 455 U.S. 379.)

The court pauses to note that although Defendants appear to argue that they are asserting a factual challenge to standing, they conflate the legal standards for facial versus factual challenges. (*Compare* Defs.' Mot. 15 (arguing that the Organizational Plaintiffs must establish standing by a preponderance of the evidence); Defs.' Reply 5 (same); *with* Defs.' Reply 6 (stating that the *Twombly-Iqbal* standard governs the inquiry and arguing that the Organizational Plaintiffs "have not alleged a *plausible* basis for standing" (emphasis added)).) Defendants' core argument, though, is that the Organizational Plaintiffs "have not alleged a concrete and particularized injury

that could be redressed by the equitable relief sought." (Defs.' Mot. 18-19.) Moreover, as discussed below, Defendants have not presented "external facts" that cast doubt on the court's jurisdiction. *Apex Digital*, 572 F.3d at 444. Accordingly, Defendants' Rule 12(b)(1) motion presents a facial challenge to standing. *See, e.g.*, *Silha*, 807 F.3d at 173 ("Defendants' Rule 12(b)(1) motion is properly understood as a facial challenge because they contend that Plaintiffs' complaint lacks sufficient factual allegations to establish standing."). The court therefore accepts all well-pleaded factual allegations as true and draws all reasonable inferences in the Organizational Plaintiffs' favor. *See id.*; *Remijas*, 794 F.3d at 691.

The Organizational Plaintiffs allege that they have "had to devote significant resources . . . to counteract" Defendants' alleged misconduct, which in turn has "impaired [their] ability to provide" other services. *Havens*, 455 U.S. at 379; *see, e.g.*, Second Am. Compl. ¶ 72. These allegations, if true, are sufficient to establish a concrete and particularized injury. *See Havens*, 455 U.S. at 379. Indeed, contrary to Defendants' arguments, the Organizational Plaintiffs can establish standing by alleging that due to Defendants' alleged action, they must devote more resources to certain kinds of work they were already doing. In *Havens*, for example, the plaintiff's regular activities included "the investigation and referral of complaints concerning housing discrimination." *Id.* at 368. The Supreme Court ascertained an injury based on allegations that the plaintiff had to "devote significant resources to" exactly that—"identify[ing] and counteract[ing]" defendant's alleged housing discrimination—which in turn frustrated the plaintiff's ability to conduct its other regular activities. *Id.* at 379.

The Seventh Circuit's decision in *Crawford v. Marion County Election Board*, 472 F.3d 949 (7th Cir. 2007), cited by neither side here, supports this reading of *Havens*. In *Crawford*, the court held that a voting law, which would likely discourage supporters of the Democratic Party from going to the polls, inflicted an actual injury on the Democratic Party by "compelling [it] to devote resources" to getting those supporters to the polls. *Id.* at 951 (citing *Havens*, 455 U.S. at 378). More recently, in a case decided after Defendants' motion to dismiss was fully briefed, the

Seventh Circuit squarely rejected the exact argument Defendants make here. *See Lawson*, 937 F.3d at 953-54. In *Lawson*, the defendant state officials argued that the voting-rights organizations that brought suit had not suffered actual injuries because the conduct at issue (alleged violations of the National Voter Registration Act) simply gave the plaintiff organizations "more of the work they were created to do." *Id.* The Seventh Circuit disagreed and determined that the organizations had pleaded "concrete injuries" under *Havens*. *Id.* at 954 (where organizations alleged that defendant's conduct would force them to "undertake . . . extra efforts" that fell within their mission and "reduce or eliminate their work in certain areas," they pleaded an injury-in-fact). The court in *Lawson* recognized that organizations do not "have standing based solely on the baseline work they are already doing." *Id.* at 955. Rather, "[t]he question is what additional or new burdens are created by the [actions] the organization is challenging . . . . [An organization] must show that the disruption is real and its response is warranted." *Id.* The Organizational Plaintiffs here allege that Defendants' actions increased their workload and "cost[] them time and money they would have spent differently or not spent at all." *Id.* at 954; *see, e.g.*, Second Am. Compl. ¶ 72; Benito Decl. ¶¶ 12-13; Sobrevilla Decl. ¶ 12. They also allege that they had to take on the extra work to meet the needs of their community members. *See Lawson*, 937 F.3d at 955; Second Am. Compl. ¶ 72; Benito Decl. ¶¶ 12-13. Accordingly, the Organizational Plaintiffs have pleaded an injury-in-fact that confers standing.

Defendants cite several cases that they argue compel the opposite conclusion, but each is distinguishable. In *Keep Chicago Livable v. City of Chicago*, 913 F.3d 618, 625 (7th Cir. 2019), the court determined than an organization had pleaded a "mere interest in a problem," not an actual injury. But it reached that conclusion because the organization alleged only that "uncertainty" concerning the constitutionality of an ordinance "burden[ed] [its] education and advocacy mission." *Id.* at 624. Moreover, the organization framed its claims "in terms of injury to an individual's constitutional rights," not in terms of "injury to the organization." *Id.* The Organizational Plaintiffs in this case allege that they suffered injuries distinct from those the

Individual Plaintiffs suffered. (*See, e.g.*, Second Am. Compl. ¶¶ 72, 94, 112.) In addition, they allege that Defendants' actions increased their workload and forced them to direct time and money away from some of their normal activities. The Organizational Plaintiffs, therefore, allege more than an abstract interest in a legal issue.[7] In *H.O.P.E., Inc. v. Eden Management, LLC*, 128 F. Supp. 3d 1066 (N.D. Ill. 2015), another case Defendants rely upon, the court noted that an organization's diversion of resources as an "opportunity cost" of a defendant's alleged discrimination *can* confer standing, but determined that the plaintiff could not seek shelter in that theory because it could not trace its diversion of resources to the defendant. *See id.* at 1078-79. As discussed below, the Organizational Plaintiffs do not have a traceability problem. Finally, in *Citizens for Responsibility and Ethics in Washington v. Trump*, 276 F. Supp. 3d 174 (S.D.N.Y. 2017), *vacated and remanded on other grounds*, 939 F.3d 131 (2d Cir. 2019), the court indeed rejected plaintiff's diversion-of-resources theory of standing and determined that its injuries were "self-inflicted." *Id.* at 189-91. But there, the plaintiff "fail[ed] to allege either that Defendant's actions ha[d] impeded its ability to perform a particular mission-related activity, or that it was forced to expend resources to counteract and remedy the adverse consequences or harmful effects of Defendant's conduct." *Id.* at 190. The Organizational Plaintiffs in this action allege both.

Next, Defendants argue that the Organizational Plaintiffs do not have standing because they have failed to show a causal connection between their alleged injuries and "the specific ICE practices at issue." (Defs.' Mot. 17-18; *see also* Defs.' Reply 7; *Lujan*, 504 U.S. at 560.) Specifically, Defendants contend that "given the purpose of the [telephone] hotline, any increase or change in ICE enforcement of immigration laws could result in an increase in calls." (Defs.' Mot. 18; *see also* Defs.' Reply 7 (arguing that the Organizational Plaintiffs "do not specify a

---

[7]     For this reason, *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 40 (1976), *Milwaukee Police Association v. Flynn*, 863 F.3d 636, 639 (7th Cir. 2017), and *Muro v. Target Corporation*, 580 F.3d 485, 491 (7th Cir. 2009)—which Defendants cite for the proposition that an interest in a legal issue, on its own, is insufficient to confer organizational standing—likewise do not tip the scales in Defendants' favor.

timeframe for the increased volume of calls they received" resulting from the actions at issue).) According to Defendants, therefore, the Organizational Plaintiffs' allegations that the challenged conduct caused their injuries are speculative and conclusory, and the court should not credit them. The court does not read the Organizational Plaintiffs' allegations as mere speculation that their injuries are traceable to the practices they challenge. The CEO and Executive Director of ICIRR, for example, stated in a June 2018 affidavit that "[i]n the last month," when ICE allegedly conducted the large-scale enforcement action at issue in this case, the hotline received 50 percent more calls than it did in the previous month, "when no raids were reported." (Benito Decl. ¶ 12; *see also* Sobrevilla Decl. ¶¶ 7-9 (stating that the increase in hotline calls began on May 19, 2018).) In addition, the Organizational Plaintiffs allege that the additional calls were coming from people who were reporting large-scale ICE enforcement actions or trying to find family members that ICE had detained. (*See* Second Am. Compl. ¶ 72.) There may, of course, be other reasons for the spike in calls—but this would defeat Plaintiffs' claims as unsupported factually, not as a pleading deficiency.

Defendants also argue that the Organizational Plaintiffs "affirmatively directed" community members to call the hotline with information concerning ICE's enforcement actions, and therefore created "alternative causation" for the increase in calls. (Defs.' Reply 8 (citing archived version of OCAD website).) But Defendants raised this argument on reply, so it is waived. *See Campos v. Cook Cnty.*, 932 F.3d 972, 976 n.2 (7th Cir. 2019) ("Parties waive arguments which they develop for the first time in a reply brief.") Even if Defendants had not waived the argument, it would make no difference because for purposes of causation, "[w]hat matters is whether the organizations' activities were undertaken because of the challenged [action], not whether 'they are voluntarily incurred or not.'" *Lawson*, 937 F.3d at 956 (quoting *Fla. State Conference of N.A.A.C.P v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008).) The Organizational Plaintiffs allege that the challenged conduct "creat[ed] more work for them," and that "is sufficient . . . for causation." *Lawson*, 937 F.3d at 956. It is also sufficient "for the redressability element of

standing" because absent the challenged conduct, there would "be less drain on [the Organizational Plaintiffs'] resources." *Id.* Finally, as discussed at length above, Plaintiffs seek injunctive and declaratory relief that does not require "suppressing evidence in immigration court proceedings" or "enjoining removal proceedings altogether." (*See* Defs.' Mot. 16.) Accordingly, Defendants' argument that this court can redress the Organizational Plaintiffs' alleged injuries only by violating the INA lacks merit. (*See id.*)

For the foregoing reasons, the court denies Defendants' motion to dismiss the Organizational Plaintiffs' claims for lack of standing.

**B.    Defendants' Rule 12(b)(6) Motion**

Defendants also move to dismiss Plaintiffs' APA claim under Federal Rule of Civil Procedure 12(b)(6). In assessing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court accepts all well-pleaded facts in a plaintiff's complaint as true and views them in the light most favorable to the plaintiff. *See United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018). To survive a motion to dismiss, the complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (*Id.*)

Defendants argue that Plaintiffs fail to state a claim under the APA because they have not sufficiently pleaded "final agency action." (*See* Defs.' Mot. 19 (quoting 5 U.S.C. § 704).) For an agency action to be final, "two conditions must be satisfied." *Bennett v. Spear*, 520 U.S. 154, 177 (1997). "First, the action must mark the 'consummation' of the agency's decisionmaking process." *Id.* at 177-78 (quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)). The action "must not be of a merely tentative or interlocutory nature." *Bennett*, 520 U.S. at 178.

"[S]econd, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* (quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)); *see also, e.g.*, *Dhakal*, 895 F.3d at 539 ("The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." (quoting *Franklin v. Mass.*, 505 U.S. 788, 797 (1992)). Courts approach the APA's finality requirement flexibly and pragmatically. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016); *Dhakal*, 895 F.3d at 539.

Defendants contend, first, that Plaintiffs have not sufficiently pleaded final agency action because they offer only "amorphous" descriptions of ICE practices and then allege, without support, that ICE implemented a policy to make warrantless arrests in violation of 8 U.S.C. § 1357(a)(2). (*See* Defs.' Mot. 20-21 (quoting *Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014)).) Relatedly, Defendants argue that Plaintiffs are asking the court to "extrapolate a few individual specific allegations into a generalized conclusion" that ICE implemented such a policy. (Defs.' Reply 9.) The court understands Defendants to be arguing that Plaintiffs are making a "generalized complaint about agency behavior"—which cannot give rise to a cause of action—rather than challenging discrete agency action, which can. *Bark*, 37 F. Supp. 3d at 51 (internal quotation marks omitted); *see, e.g.*, *Norton v. S. Utah Wilderness Alliance (SUWA)*, 542 U.S. 55, 62-63 (2004) (agency actions as defined in the APA are "circumscribed" and "discrete").

The court sees Plaintiffs' claim differently and is satisfied that Plaintiffs challenge discrete agency action. Plaintiffs challenge ICE's alleged policy and practice of failing to comply with a specific, mandatory, unambiguous statutory provision. (*See* Second Am. Compl. ¶¶ 97-98 (alleging that ICE has a "policy and practice of making warrantless arrests without the . . . individualized flight risk analysis" required by Section 1357(a)(2) of the INA).) Taken as true and viewed in the light most favorable to Plaintiffs, the allegations permit an inference that

this policy exists—at least in the context of large-scale enforcement actions in the Chicago area—and that ICE adopted it around May 2018. (*See, e.g.*, *id.* ¶ 31 (alleging that ICE implemented a large-scale enforcement action in New York in April 2018, which it called "Operation Keep Safe"); *id.* ¶ 32 (alleging that the "Chicago phase of 'Operation Keep Safe,'" from which this litigation arises, began in May 2018 and "bears many of the hallmarks of" the New York phase and similar enforcement actions in California in 2018); *id.* ¶ 32 (alleging that "ICE concedes that 106 of the 156" arrests in May 2018 were made without warrants; concedes that about half of the people arrested "had no criminal records"; and states that it will continue implementing large-scale enforcement actions that will "inevitably result in additional [warrantless] arrests" (internal quotation marks omitted)).) The fact that Plaintiffs have not identified a written policy does not change this conclusion because "agency action need not be in writing to be judicially reviewable as a final action." *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 138 (D.D.C. 2018) (citing *Venetian Casino Resort LLC v. Equal Emp't Opportunity Comm'n*, 530 F.3d 925, 929, 931 (D.C. Cir. 2008) (adjudicating challenge to agency's "decision . . . to adopt [an unwritten] policy of disclosing confidential information without notice")); *see also, e.g.*, *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (court can review an unwritten agency policy).

Moreover, Plaintiffs challenge ICE's specific application of the alleged policy to the Individual Plaintiffs and others similarly situated. (*See id.* ¶¶ 5, 8, 17-21 (alleging that ICE officers failed to conduct the statutorily required flight-risk analysis in arresting all five Individual Plaintiffs without warrants); *id.* ¶ 63 (alleging that the arrests of the Individual Plaintiffs "reflect a pattern of behavior . . . that [ICE] has openly stated it will continue using"); *see also* Pls.' Opp. 20 ("Violating the unambiguous statutory requirements of the INA is a final agency action subject to review under the APA.").) An agency action is reviewable "to the extent that, specific 'final agency action' has an actual or immediately threatened effect." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990). Here, Plaintiffs allege that ICE officers acted in a discrete, specific manner when they conducted warrantless arrests of the Individual Plaintiffs and others similarly situated, and they

allege that those actions harmed them. These allegations sufficiently plead discrete agency actions. *See, e.g.*, *Aracely, R.*, 319 F. Supp. 3d at 139 (ICE's "rejections of Plaintiffs' parole requests—purportedly upon consideration of an improper factor"—are agency actions that have actual or immediately threatened effects); *Ramirez v. U.S. Immigration & Customs Enforcement*, 310 F. Supp. 3d 7, 21-22 (D.D.C. 2018) (determining that "[t]he placements of [plaintiffs] in ICE adult detention facilities—purportedly without mandated consideration of less restrictive placements—are agency actions"); *R.I.L.-R*, 80 F. Supp. 3d at 184 ("ICE's consideration of an allegedly impermissible factor in making custody determinations" is "particularized agency action" reviewable under the APA).

Because Plaintiffs challenge the adoption of an alleged policy that allows Defendants to violate a specific statutory provision, as well as specific applications of that policy, their APA claim is unlike that in *Bark*, where the court could not discern any specific policy from the record. *See* 37 F. Supp. 3d at 51.[8] For the same reasons, it is distinguishable from *SUWA* and *Lujan*, which concerned broad programmatic attacks. *See SUWA*, 542 U.S. at 65-66 (plaintiff asked the court to "enter [a] general order[] compelling compliance with [a] broad statutory mandate[]": "continu[ing] to manage [land] . . . in a manner so as not to impair the suitability of such areas for preservation as wilderness"); *Lujan*, 497 U.S. at 890 (plaintiff challenged "the entirety of" a "land withdrawal review program" that encompassed an agency's "operations . . . in reviewing withdrawal revocation applications," "classif[ying] . . . public lands", and "developing land use

---

[8]     *Lightfoot v. District of Columbia*, 273 F.R.D. 314 (D.D.C. 2011), which Defendants also cite, *see* Defs.' Mot. 21, does not concern agency action under the APA. In *Lightfoot*, former employees brought a putative class action in which they alleged that the District of Columbia violated their Due Process rights in terminating their disability benefits. *See id.* at 316. The court granted the District's motion to decertify the class. *See id.* The court determined, among other things, that in alleging a "wide variety of practices" and calling them "systemic failures," the plaintiffs failed both to identify the offending "policy or custom" and establish that it was common to the class. *See id.* at 326 (internal quotation marks omitted). As already discussed, Plaintiffs in this case have sufficiently pleaded a specific policy. And the question whether Plaintiffs have properly brought their case as a class action is not presently before the court.

plans"). Nor are Plaintiffs asking the court to assume that a policy exists based on allegations "that Defendants took certain action with respect to" only one plaintiff. *Pearl River Union Free Sch. Dist. v. King*, 214 F. Supp. 3d 241, 260 (S.D.N.Y. 2016); *see* Defs.' Mot. 22 (citing same). Rather, as noted, Plaintiffs allege that ICE applied the policy in five specific cases, and likely in numerous others. (*See* Second Am. Compl. ¶¶ 5, 8, 17-21, 32, 63.)[9]

Defendants also contend that Plaintiffs have not pleaded *final* agency action because, according to Defendants, ICE officers' "decisions to stop, question, and eventually arrest the [Individual Plaintiffs] were aspects of the initiation of removal proceedings before an immigration judge and not the consummation of the administrative decision-making process." (Defs.' Mot. 20; *see also* Defs.' Reply 9-10.) This argument, too, lacks force because it improperly merges the decision to make an arrest with the decision to initiate removal proceedings. In the circumstances alleged, the decisions are separate. Indeed, Plaintiffs allege that when ICE officers act pursuant to the challenged policy, they do not yet have a basis to suspect that the arrestees are in fact removable from the United States. Viewing the allegations in the light most favorable to Plaintiffs—and applying the APA's finality requirement pragmatically—Plaintiffs sufficiently plead that ICE "consummat[ed] [its] decisionmaking process" by making arrests in violation of Section 1357(a)(2) and pursuant to an agency policy. *Bennett*, 520 U.S. at 177 (quoting *Chi. & S. Air Lines*, 333 U.S. at 113.) Likewise, Plaintiffs sufficiently plead that ICE's decisionmaking process had "legal consequences." *Bennett*, 520 U.S. at 178 (quoting *Rederiaktiebolaget Transatlantic*, 400 U.S. at 71). Among other things, Plaintiffs allege that ICE's decisions caused the Individual

---

[9] Plaintiffs also argue that they have pleaded agency action in the form of a *failure to act*—specifically, ICE's alleged failure to make statutorily required, particularized flight-risk determinations. (*See* Pls.' Opp. 20.) "Agency action" under the APA does, indeed, include "failure to act," 5 U.S.C. § 551(13), and the APA allows a court to "compel agency action unlawfully withheld or unreasonably delayed," *id.* § 706(1). But Plaintiffs do not assert a claim under Section 706(1) (*see generally* Second Am. Compl.); their briefing on this point is undeveloped; and they argue that ICE's affirmative violation of Section 1357(a)(2)'s "unambiguous statutory requirements" is the "final agency action" they challenge. (*See* Pls.' Opp. 20.) The court, therefore, does not address the viability of Plaintiffs' "failure to act" theory.

Plaintiffs and others similarly situated to lose their freedom. Plaintiffs, therefore, sufficiently plead final agency action.

Ample case law supports this conclusion. *See, e.g.*, *Arcady R.*, 319 F. Supp. 3d at 139 (ICE's alleged policy of improperly considering deterrence as a factor in reviewing parole requests, which ICE purportedly applied to plaintiffs, was a final agency action); *Ramirez*, 310 F. Supp. 3d at 22-23 (plaintiffs identified final agency action in alleging that "ICE placed them in adult detention facilities without considering less restrictive placements as required by" statute); *R.I.L.-R*, 80 F. Supp. 3d at 185 ("ICE's consideration of an allegedly impermissible factor in making custody determinations" had "profound and immediate consequences for Central American asylum seekers detained as a result," and was a final agency action); *cf. Moreno*, 213 F. Supp. 3d at 1008-09 (determining that ICE violated Section 706(2)(C) of the APA by issuing detainers for warrantless arrests without making the required individualized flight-risk determinations under 8 U.S.C. § 1357(a)(2), but parties appear not to have disputed whether plaintiffs pleaded final agency action).

In a final push for dismissal, Defendants contend that if the court finds Plaintiffs have sufficiently pleaded final agency action, "every immigration arrest" would be "collaterally attacked and litigated in Federal District Court, rather than in Immigration Court and petitions for review in Circuit Court as provided by Congress." (Defs.' Reply 10 (citing 8 U.S.C. § 1252(a)(5) and § 1252 (b)(9)).) But as already discussed, where, as here, claims raise factual and legal issues that are remote from the issue of removability, the INA does not channel them into immigration court and limit review to consideration of final removal orders. Accordingly, the court's conclusion that Plaintiffs have identified final agency action should have no effect on the INA's jurisdiction-channeling function. Plaintiffs have pleaded final agency action subject to judicial review, and the court denies Defendants' Rule 12(b)(6) motion to dismiss Plaintiffs' APA claim.

## **CONCLUSION**

For the foregoing reasons, the court denies Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(1) and Federal Rule of Civil Procedure 12(b)(6) [66]. Defendants are directed to file their answers within 28 days.

ENTER:

Dated:  January 24, 2020

_____
REBECCA R. PALLMEYER
United States District Judge