**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MARGARITO CASTAÑON NAVA,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **No. 18-cv-3757** |
| | ) | |
| **v.** | ) | **Judge Jeffrey I. Cummings** |
| | ) | |
| **DEPARTMENT OF HOMELAND** | ) | |
| **SECURITY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

In 2018, five individual plaintiffs (Margarito Castañon Nava, John Doe, Miguel Cortes Torres, Guillermo Hernandez Hernandez, and Erick Rivera Sales) and two organizational plaintiffs (the Illinois Coalition for Immigrant and Refugee Rights and Organized Communities Against Deportations) filed this class action lawsuit against defendants including the Department of Homeland Security (DHS) and the U.S. Immigration and Customs Enforcement (ICE)[1] to ensure that ICE complies with its statutory obligations under 8 U.S.C. §1357(a)(2) when conducting warrantless arrests of persons who have not obtained lawful immigration or citizenship status in the United States.[2] After the Court (then Chief Judge Pallmeyer) denied ICE's motion to dismiss, the parties agreed to settle this case. The Court certified a settlement

---

[1] Plaintiffs also named Kristi Noem (Secretary of DHS), Todd Lyons (Acting Director of ICE), and Sam Olson (Acting Field Office of the ICE Chicago Field Office) as defendants in this lawsuit. For purposes of this Memorandum Opinion and Order, the Court will refer to defendants collectively as "ICE" unless otherwise noted.

[2] As the Department of Justice has done in a recent filing, this Court will use the term "foreign national" as equivalent to the statutory term "alien" within the Immigration and Nationality Act ("INA"). *See* 8 U.S.C. §1101(a)(3) (defining "alien" as "any person not a citizen or national of the United States."); *Noem v. Patel*, No. 25 C 11180 (N.D.Ill. Sept. 16, 2025) (Dckt. #8 at 1 n.1).

class and granted final approval of the parties' settlement agreement (the "Agreement") on February 8, 2022. The Agreement imposed several obligations on ICE related to arrests of persons without a warrant for a civil violation of U.S. immigration laws within ICE's Chicago Area of Responsibility (namely, the states of Illinois, Indiana, Wisconsin, Missouri, Kentucky, and Kansas). The Agreement had a three-year term that was set to expire on May 12, 2025, unless enforcement provisions within the Agreement triggered its extension.

The parties agree that they were able to resolve any disputes concerning ICE's compliance with the Agreement during the first two-and-one-half years of its term. However, shortly after the second Trump Administration began in late January 2025, plaintiffs' counsel received multiple reports from class members alleging that ICE agents had arrested them without warrants in violation of the Agreement and the governing law (8 U.S.C. §1357(a)(2)). After trying, without success, to resolve their disputes with ICE, plaintiffs filed their motion to enforce the Court's order regarding the parties' Agreement. (Dckt. #164).

Plaintiffs' motion, as supplemented, asserts that ICE has engaged in repeated, material violations of the Agreement and it seeks relief on behalf of twenty-six class members who plaintiffs claim were subjected to unlawful warrantless arrests. To be clear, plaintiffs do not challenge ICE's authority to make targeted arrests of foreign nationals with administrative arrest warrants issued pursuant to 8 C.F.R. §§236.1(c)(9), 1236.1(c)(9). Nor do plaintiffs challenge the authority of ICE and other law enforcement authorities to arrest foreign nationals with judicial arrest warrants issued in connection with alleged violations of federal and state criminal laws. ICE, in its response to plaintiffs' motion, asserts that ICE agents had valid administrative warrants to arrest roughly half of the persons in question and that ICE officers properly executed warrantless arrests of the remainder.

2

Plaintiffs have also filed a motion pursuant to Rule of Civil Procedure 60(b) to modify the final approval order enforcing the terms of the Agreement. (Dckt. #177). Plaintiffs assert that ICE failed to substantially comply with the Agreement by: (1) virtue of repeated, material violations described in the preceding paragraph; (2) instructing its agents to circumvent the requirements of the statute governing warrantless arrests by having them create post-hoc warrants in the field for individuals who were already under arrest; and (3) declaring (through its principal legal advisor) on June 11, 2025 that ICE's obligations under the Agreement were terminated despite the fact that the Agreement—by its terms—is still in effect by virtue of plaintiffs' pending motion to enforce. Plaintiffs urge the Court to extend the term of the Agreement by three years and to impose additional obligations on ICE. ICE, in response, denies that its officers violated the Agreement, asserts that plaintiffs failed to meet the requirements of Rule 60(b), and further asserts that the Agreement already expired at the time its legal advisor made his June 11, 2025 declaration.

Finally, on September 26, 2025, plaintiffs filed a "notice of additional violations of consent decree and request for status conference" in which plaintiffs allege that ICE has engaged in over twenty-five additional violations of the Agreement in connection with "Operation Midway Blitz," a major on-going immigration enforcement campaign targeting the Chicagoland area. (Dckt. #199 at 2). Plaintiffs further noted that they have received over seventy additional referrals of potential violations of the Agreement. (*Id.* at 2–3). On September 30, 2025, plaintiffs filed a "supplemental notice of consent decree violations" in which they allege that ICE has "dramatically escalated" its enforcement in Chicago in violation of the Agreement. (Dckt. #205). On October 1, 2025, ICE filed a "brief response to plaintiffs' notice of additional violations of consent decree and supplemental notice of consent decree violations" in which it

generally disputed plaintiffs' allegations, noted that plaintiffs had made no attempt to meet and confer with ICE regarding the allegations in the notice and supplemental notice, and requested an opportunity to file a more fulsome response after appropriations funding the continued operation of the Department of Justice has been restored.  (Dckt. #208).

## II.  SUMMARY OF RULINGS

After considering the parties' submissions and their presentations at the June 27, 2025 oral argument, the Court finds as follows.  First, the Court finds that plaintiffs have shown by a preponderance of the evidence that ICE arrested twenty-two out of the twenty-six claimant class members without a warrant in violation of the Agreement and the requirements of 8 U.S.C. §1357(a)(2).  The Court orders ICE to provide relief to those individuals under the terms of the Agreement and to pay the attorney's fees that plaintiffs incurred in bringing their motion to enforce.  Second, the Court, in its discretion, finds that plaintiffs have met their burden under Rule 60(b)(5) of showing that a modification of the Agreement is warranted because ICE has failed to substantially comply with its terms.  The Court, however, finds that plaintiffs' proposed modifications to the Agreement are not suitably tailored to address ICE's non-compliance. Instead, the Court will extend the Agreement until February 2, 2026, which corresponds to the number of days between the date that ICE unequivocally ceased its compliance with the Agreement (June 11, 2025) and the date of this Memorandum Opinion and Order to provide plaintiffs with the full three-year term of the Agreement for which they bargained.  The Court will also adjust the reporting requirements imposed on ICE to better ensure that plaintiffs can track ICE's compliance with the Agreement.

In the sections that follow, the Court will provide: an overview of federal immigration law as it bears on the matters at issue (Section III); the procedural history of this case (Section

4

IV); a description of the parties' Agreement (Section V); an assessment of plaintiffs' motion to enforce and an evaluation of the claim of each class member who seeks relief (Section VI); an assessment of plaintiffs' motion to modify and an explanation of why the relief awarded is suitably tailored to address ICE's violation of the Agreement (Section VII); and the procedure regarding how the alleged violations of the Agreement in plaintiffs' notice and supplemental notice will be handled by the Court (Section VIII).

### III. OVERVIEW OF FEDERAL IMMIGRATION LAW

Courts have long recognized that the federal government "has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). "Congress, by virtue of the Immigration and Nationality Act (INA), has authorized the Department of Homeland Security, through Immigration and Customs Enforcement, to carry out federal immigration law," which "includes [the] authority to interview, arrest, and detain removable aliens." *Lopez-Lopez v. Cnty. of Allegan*, 321 F.Supp.3d 794, 796 (W.D.Mich. 2018). As a general rule, it is not a crime for a removable foreign national to remain present in the United States. *Arizona*, 567 U.S. at 407.[3] Nonetheless, immigration officers are authorized to interrogate any foreign national or person believed to be a foreign national as to his or her right to be or remain in the United States without the need for a warrant. *See* 8 U.S.C. §1357(a)(1). Moreover, ICE officers have the regulatory authority to "briefly detain" a person for questioning if they have a reasonable suspicion that the person being questioned is a foreign national illegally in the United States. *See* 8 C.F.R. §287.8(b)(2).

---

[3] As the Ninth Circuit has explained, "[a] migrant who is illegally present in the United States may have committed a civil violation—by overstaying a visa, changing her student status, or acquiring prohibited employment—or a criminal violation, by entering the country illegally." *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 938 (9th Cir. 2020).

When a foreign national is suspected of being removable, a federal official issues an administrative document called a "Notice to Appear" ("NTA"). *Arizona*, 567 U.S. at 407 (citing 8 U.S.C. §1229(a)); *Vasquez Perez v. Decker*, No. 18-CV-10683 (AJN), 2019 WL 4784950, at *1 (S.D.N.Y. Sept. 30, 2019) (noting that the NTA is the charging document in the removal proceedings). At the time of an NTA's issuance (or at any time thereafter until the removal proceedings are completed), the Attorney General—through specified ICE agents—may issue a warrant of arrest known as a Form I-200 that provides authority for the arrest of the foreign national named in the NTA. *Arizona*, 567 U.S. at 407 (citing 8 U.S.C. §1226(a)); 8 C.F.R. §§236.1(b), 1236.1(b). Furthermore, "[t]he cancellation of a notice to appear also cancels any outstanding warrants issued by the Attorney General for the alien's arrest." *Saqr v. Holder*, 580 F.3d 414, 422 (6th Cir. 2009), *quoting* 8 C.F.R. §239.2(e); *see* 8 C.F.R. §239.2 (listing grounds for the cancellation of NTAs).

If no federal warrant has been issued, ICE officers "have more limited authority" to arrest persons whom they believe to be foreign nationals. *Arizona*, 567 U.S. at 408. In particular, the governing statute (8 U.S.C. §1357(a)(2)) and corresponding regulation (8 C.F.R. §287.8(c)(2)(ii)) allow ICE agents to make warrantless arrests only where they have a reasonable belief that the alien "is likely to escape before a warrant can be obtained." *Arizona*, 567 U.S. at 408. As the Supreme Court has observed, "the deportation process ordinarily begins with a warrantless arrest" by an ICE agent. *Reno v. Flores*, 507 U.S. 292, 307 (1993). Thus, despite the ability of ICE officers to issue and obtain arrest warrants, warrantless arrests of foreign nationals are more common. *Id.*

## IV. THE PROCEDURAL HISTORY OF THIS LAWSUIT

Plaintiffs' claims in this lawsuit arose from Operation Keep Safe, which was a large-scale ICE enforcement action that occurred in the Chicago area during a weeklong period in May 2018. *See Nava v. Dept. of Homeland Security*, 435 F.Supp.3d 880, 885 (N.D.Ill. 2020). ICE reportedly made 156 arrests during that operation, including the arrests of 106 people (including the individual plaintiffs) for whom ICE agents lacked an arrest warrant. *Id.* The parties refer to these warrantless arrests of individuals who were encountered by ICE agents while in the community and previously unknown to ICE as "collateral arrests." *Id.*; (Dckt. #164 at 7). Plaintiffs alleged that ICE agents arrested and detained each individual plaintiff without making an individualized determination that he or she was "likely to escape before a warrant c[ould] be obtained for [the] arrest" in violation of 8 U.S.C. §1357(a)(2). *Nava*, 435 F.Supp.3d at 885.

After the Court denied ICE's motion to dismiss, the parties began settlement negotiations in mid-2020. The parties had one settlement conference over which the undersigned (then a Magistrate Judge) presided, and they thereafter continued to negotiate, exchange updated settlement proposals, and submit eleven joint reports regarding the status of their settlement negotiations. Ultimately, the parties made a deal, and they executed their Settlement Agreement on November 30, 2021.

Judge Pallmeyer granted preliminary approval of the parties' Agreement on December 1, 2021. (Dckt. #149). Thereafter, Judge Pallmeyer certified a settlement class consisting of all current and future persons arrested without a warrant for a civil violation of U.S. immigration laws within the ICE Chicago Field Office's Area of Responsibility. (Dckt. #158 at 4). She then granted plaintiffs' motion for final approval on February 8, 2022, after finding that the Agreement was a final, fair, reasonable, adequate and binding release of the claims of plaintiffs

and class members that was negotiated at arms-length between parties who were represented by experienced counsel under court supervision. (Dckt. #158). The Court's final approval order states that "[t]he terms of the Settlement Agreement shall be deemed incorporated herein as if explicitly set forth and shall have the full force of an order of this Court." (*Id.*, at 5).

## V. THE PARTIES' SETTLEMENT AGREEMENT

The parties' Agreement, in pertinent part, provides as follows:

- Broadcast Statement of Policy—Section IV.A (Dckt. #155-1 at 6–7, 18–20)

    The Agreement included a Broadcast Statement of Policy ("Broadcast") that was to be issued to ICE officers nationwide and which articulated the standards for how ICE officers are to conduct warrantless arrests in a manner that is consistent with 8 U.S.C. §1357(a)(2).

    In particular, the Broadcast provides that:

    (1) officers are required before making a warrantless arrest to have probable cause that the individual is in the United States in violation of U.S. immigration law *and* that the individual is likely to escape before a warrant can be obtained for the arrest;

    (2) when determining "likelihood of escape," ICE officers are required to consider the totality of the circumstances, including the officer's ability to determine the person's identity; knowledge of that individual's prior escapes or evasions of immigration authorities; attempted flight from an ICE officer; and the person's ties to the community (such as a family, home, or employment);

    (3) ICE officers must document the facts and circumstances surrounding a warrantless arrest in the narrative section of the foreign national's I-213 Form[4] as soon as practicable; and

    (4) the documentation must include: a statement that the foreign national was arrested without a warrant; the location of the arrest and the nature of the location where the arrest took place (e.g., residence, business, etc.); whether the foreign national is connected to the location (e.g., are they an employee of the business or resident of the home); the foreign national's ties to the community, if known at the time of the arrest; and the specific, particularized facts

---

[4] "A Form I-213, or a 'Record of Deportable/Inadmissible Alien' . . . is an 'official record' prepared by immigration officials when initially processing a person suspected of being in the United States without legal permission." *Punin v. Garland*, 108 F.4th 114, 119 (2d Cir. 2024) (cleaned up).

supporting the conclusion that the foreign national was likely to escape before a warrant could be obtained.  (Dckt. #155-1 at 6, 18–19).

Notably, the Broadcast requires that "[i]nformation learned post-arrest relevant to custody determination should be documented separately from the information relevant to likelihood of escape known at the time of the warrantless arrest." (*Id.* at 19);

- Training—Section IV.B (*Id.* at 7–8)

    ICE was required to adopt, or to amend, current training materials to ensure compliance with the terms of the Broadcast.  (*Id.* at 7);

- Compliance Reporting and Production—Section IV.D (*Id.* at 8–9)

    ICE was required to provide plaintiffs' counsel (on a monthly basis) with copies of all I-213s related to warrantless arrests conducted pursuant to 8 U.S.C. §1357(a)(2), including vehicle stops resulting in such warrantless arrests, conducted in the Northern District of Illinois.  (Dckt. #155-1 at 8);

- Motions to Enforce—Section V.C (*Id.* at 11)

    The parties may move to enforce the Agreement through a motion to enforce after their efforts to attempt to resolve their dispute(s) have proven unsuccessful.  Plaintiffs may bring a motion to enforce to address either "allegations of individual violations" (under Section V.A) or "allegations of repeated, material violations" (under Section V.B).  In addition to providing relief for individual class members, the Court has the discretion to provide any equitable remedies not otherwise specified if it grants a motion to enforce based on allegations of repeated, material violations.  (*Id.*).  In addition, plaintiffs' counsel shall be entitled to recover their reasonable attorney's fees and costs for any successful motion to enforce if the Court finds that ICE's position was not substantially justified.  (*Id.* at 12);

- Remedies for Class Members—Section IV.E (*Id.* at 9–10)

    Class members who are arrested contrary to the terms of the Agreement and are in ICE custody shall be released from custody on their own recognizance without posting bond as soon as practicable subject to certain exceptions (such as where the class member is subject to mandatory detention pursuant to the INA).  Class members who were arrested contrary to the terms of the Agreement and who were released on conditions including that they post bond shall have their bond payments reimbursed and any conditions of release lifted subject to listed exceptions.  (*Id.* at 9); and

9

- Duration of the Agreement—Section III.A (*Id.* at 5)

  Section III.A provides that: "This Agreement shall be enforceable for a period of three years from the Effective Date; after which time, absent a pending motion to enforce its terms, the Agreement shall automatically terminate and dissolve without further action. If a motion to enforce under Section V.A. of this Agreement is pending at the time the Agreement would otherwise terminate, all other obligations will cease and the only issue remaining will be the resolution of the pending motion. (*Id.*).

The parties agree that the Agreement's effective date was May 13, 2022 and that the Agreement's three-year term would have expired on May 12, 2025 unless the expiration of its term was tolled by Section III.A of the Agreement. However, the parties dispute the current status of the Agreement based on their differing interpretations of Section III.A. Plaintiffs assert that the Agreement remains in full force and effect pending the resolution of their motion to enforce because they filed their motion under Section V.B ("allegations of repeated, material violations"). ICE asserts that all obligations under the Agreement have ceased and that the only issue remaining is the resolution of plaintiffs' motion to enforce. (Dckt. #184 at 15).

The Court agrees with plaintiffs' interpretation for the reasons stated at oral argument, (Dckt. #197 at 8–15). To recap, the Agreement provides, and the parties agree, that the interpretation of the Agreement is construed in accordance with federal common law. (Dckt. #155-1 at 13); *see United States v. Rand Motors*, 305 F.3d 770, 774 (7th Cir. 2002) ("A settlement agreement is essentially interpreted as a contract. In this case, federal law controls the interpretation of the agreement . . . and we therefore apply federal common law rules of contract interpretation.") (cleaned up). "The principle that a contract is construed to give effect to all of its provisions does not exempt contracts with the United States." *First Nationwide Bank v. United States*, 431 F.3d 1342, 1347 (Fed.Cir. 2005); *Bell/Heery v. United States*, 739 F.3d 1324,

1331 (Fed.Cir. 2014) ("A contract must also be construed as a whole and in a manner that gives meaning to all of its provisions and makes sense.") (cleaned up).

The first sentence of Section III.A provides that the Agreement shall be enforceable for a three-year period after the effective date and shall terminate and dissolve without further action "absent a pending motion to enforce its terms." (Dckt. #155-1 at 5). The second sentence provides that if a motion to enforce under Section V.A for "allegations of individual violations" is pending at the time the Agreement would otherwise terminate, "all other obligations will cease and the only issue remaining will be the resolution of the pending motion." (*Id.*). The clear meaning of Section III.A, taken as a whole, is that a pending motion to enforce the Agreement under Section V.B for "allegations of repeated, material violations" leaves the Agreement in effect until the motion is ruled upon. The contrary construction urged by ICE would require the Court to give *no* effect to the qualifying language of the second sentence of Section III.A (namely, the reference to a "motion to enforce filed under Section V.A") such that the sentence would read as follows: "If a motion to enforce is pending at the time the Agreement would otherwise terminate, all other obligations would cease and the only remaining issue remaining will be the resolution of the pending motion." Such an interpretation is rejected because it would violate the principle that a contract must be construed "in a manner that gives meaning to all of its provisions." *Bell/Heery*, 739 F.3d at 1331 (cleaned up).

## VI. PLAINTIFFS' MOTION TO ENFORCE

In their motion to enforce, as supplemented, plaintiffs explicitly assert that ICE and its agents have engaged in "repeated, material violations" as defined in Section V.B of the Agreement and they seek relief on behalf of twenty-six class members whom they claim were subjected to warrantless arrests in violation of terms of the Agreement. (Dckt. #164 at 8, 33–36).

The majority of the alleged violations concern class members who were impacted by a federal law enforcement operation entitled "Operation Safeguard 2025" that was conducted from January 26, 2025 through January 31, 2025 in the Chicago and surrounding suburbs to apprehend foreign nationals. (Dckt. #174-1 at 4). Twelve other class members were impacted by a February 7, 2025 mass arrest at a restaurant in Liberty, Missouri.

Plaintiffs assert that each class member was subjected to a warrantless arrest that failed to comply with the Agreement's requirement that ICE officers have facts supporting probable cause that the class member was "likely to escape before a warrant can be obtained for his arrest."[5] ICE asserts a two-pronged rebuttal. First, ICE asserts that it did, in fact, have probable cause to believe that the class members that it admits were subjected to a warrantless arrest were likely to escape before a warrant could be obtained for their arrests. Second, ICE asserts that arrests of the remaining class members were not warrantless arrests because ICE agents prepared and served Form I-200 warrants[6] on these class members at the scene of their arrest. ICE further asserts that its agents were exercising their statutory authority to question the foreign nationals, who were not actually arrested until the I-200s were prepared, signed, and served.

In reply, plaintiffs reiterate that ICE lacked probable cause at the time of the arrests to show that the class members who were subjected to a warrantless arrest were likely to escape before a warrant for their arrest could be obtained. Plaintiffs further assert that ICE agents lack

---

[5] The evidence shows (and plaintiffs do not dispute) that ICE had sufficient probable cause to believe that the class members were in the United States in violation of U.S. immigration laws based on one or more sources of evidence: the verbal admissions of the class member, documentation produced by the class member to the ICE agents, and biometric confirmation of the class member's identity. *See, e.g.*, *Orellana v. Nobles Cnty.*, 230 F.Supp.3d 934, 945 (D.Minn. 2017) (foreign national's "admission regarding his immigration status provided probable cause for the first half of what §1357(a)(2) demands.").

[6] "A Form I-200, which is entitled 'Warrant of Arrest,' is an administrative arrest warrant issued against aliens for civil immigration violations by an authorized immigration officer." *Chavez v. McFadden*, 843 S.E.2d 139, 143 n.1 (N.C. 2020) (citing 8 C.F.R. §236.1(b)(1); 8 U.S.C. §1226).

legal authority to issue Form I-200 warrants to foreign nationals (such as the class members) whom they encounter in the field. Thus, according to plaintiffs, any arrests made pursuant to these invalid Form I-200 warrants must be treated as warrantless arrests, and these arrests were not valid warrantless arrests because ICE lacked sufficient evidence that the class members were likely to escape before a valid warrant could be obtained.

The parties agree that plaintiffs must prove each alleged violation of the Agreement by a preponderance of the evidence. (Dckt. #197 at 29–30). The parties also agree that this Court has the authority to resolve plaintiffs' motion to enforce.

**A. The Class Members Whom the Parties Agree Were Subjected to Warrantless Arrests.**

The parties agree that fourteen class members were subjected to a warrantless arrest. (Dckt. ##197 at 44; 173 at 34). These class members include the twelve individuals who were arrested in Liberty, Missouri on February 7, 2025 (Imelda Minquis Villaseca, Jesus Espinoza-Magana, Sandra Julieta Jurado-Castaneda, Uriel Windell Campechano-Pelayo, Julio Corona-Guerrero, Cristino Moso-Portillo, Pastor Martinez-Manzanarez, Victor Espinoza-Magana, Gustavo Robles-Lopez, Nazario Tiburcio-Patricio, Reymundo Mauricio-Agustin, and Silvia Cerda-Sajuan) ("the Liberty 12"); and Senen Becerra Hernandez. The parties also agree that ICE did not have a warrant for another class member (Julio Noriega), but they dispute whether he was arrested by ICE or even had any contact with ICE agents.

**1. The Claims of the Liberty 12.**

**a. The facts regarding the February 7, 2025 Liberty, Missouri arrests.**

The facts regarding the February 7, 2025 mass arrests of the Liberty 12 at El Potro restaurant in Liberty, Missouri are drawn from the declaration of ICE Special Agent in Charge Mark Zito, (Dckt. #173-2), the affidavit of Francisco De La Torre, the restaurant owner, (Dckt.

#166-15), security video footage from inside the restaurant on February 7, 2025, (Dckt. #176), and screenshots taken from the security video footage, (Dckt. #166-21).

ICE targeted the El Potro restaurant because it believed that a foreign national with a felony narcotics conviction was employed there. (Dckt. #173-2 at 5). ICE officers approached the restaurant on February 7, 2025, to apprehend that suspect. (*Id.*).

The restaurant owner provided the following testimony in his affidavit. (Dckt. #166-15 at 1–6). At around 10:50 a.m. on February 7, 2025, shortly after he arrived to prepare to open the restaurant, the owner observed approximately six armed persons who appeared to be law enforcement standing across the dining area and several others who were standing outside and seemingly surrounding the restaurant. Once he identified himself as the owner, one of the officers told him that they were from ICE, they were looking for a person, and asked if they could try to find them. The owner, who observed approximately fifteen officers, did not feel that he could refuse the officer's request and he told the officers that they could set up in one of the open concept dining rooms. The officers proceeded to do so and an officer asked the owner if he could bring his employees in one at a time. The owner then brought in his employees and did not tell them that they had the option not to speak with the ICE agents.

The security video footage, (Dckt. #176), confirms that the employees entered the dining room one at a time, had brief interactions with the agents, and then certain employees were seated in booths within the dining room with armed agents stationed at each entry/exit to the room, (Dckt. #166-21 at 3–5). At one point, an agent approached one of the female employees, Silvia Cerda-Sajuan ("Silvia C."), who was seated in a booth, pulled her out of her seat, handcuffed her, and walked her out of the dining area. (*Id.* at 3–4).[7] Additional employees were

---

[7] ICE officers determined that Silvia was a previously removed foreign national who was subject to mandatory detention under Section 241 of the INA. (Dckt. #173-2 at 6).

brought into the dining room and seated in booths until approximately ten employees were present. An agent walked in with a laptop and set up a table at one end of the dining room where the employees were seated. Roughly ten minutes later, (Dckt. #176 at 41:03), two workers who were not seated in the dining room tried to exit out the back door to the restaurant. Four ICE agents got out of their cars and ushered the employees back into the restaurant. Agents were thereafter stationed at a back door for the remainder of the video and at another exit for the majority of the video, effectively blocking any restaurant employee from being able to leave. Eventually, an eleventh employee was brought in and seated in the dining room. None of the workers in the dining room got out of their seats unless they were with an agent.

The owner further testified that an agent approached him and asked if those were all of his employees. After the owner said yes, the agent checked the office and the storeroom to verify the owner's statement. According to the owner, the agent then asked him to retrieve the employment-related documents for his employees, and the owner brought two boxes from the office. The officer took the boxes and said he would bring them back. Ultimately, the officers escorted each of the eleven employees from the dining room outside, handcuffed them, and placed them into vans because ICE determined that the employees had no valid immigration status. (Dckt. #173-2 at 6). According to the timestamps on the video footage, nearly two hours elapsed between the time the first employees were seated in the booths in the dining room and when the last employee was taken outside and handcuffed.

### b. The evidence establishes that the Liberty 12 were placed under arrest during the course of their detention in the dining room.

As stated above, ICE agents had the regulatory authority to "briefly detain" employees at the El Potro restaurant for questioning if they had a reasonable suspicion that they were foreign nationals who were illegally in the United States. *See, e.g., United States v. Mejia-Flores*, No.

8:11CR375, 2012 WL 525485, at \*6 (D.Neb. Feb. 16, 2012). At the same time, courts have long recognized that what begins as "[a]n investigative detention may escalate into a full-blown arrest." *United States v. Moya-Matute*, 735 F.Supp.2d 1306, 1326 (D.N.M. 2008). A person has been "seized" within the meaning of the Fourth Amendment, and is therefore under arrest "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Tyler*, 512 F.3d 405, 409–10 (7th Cir. 2008) (cleaned up).

Here, the evidence shows that the employees would have reasonably believed that they were not free to leave after they were questioned by the armed ICE officers and seated within the dining room. To recap, the employees were directed by their employer to the dining room to speak to the ICE officers one at time; they were thereafter seated in a relatively small, confined room with armed officers posted at both possible exit points; other armed officers were posted at the front and rear entrances of the restaurant; the employees left the dining room only when escorted by an agent; two other workers who were not seated in the dining room attempted to leave the restaurant but were stopped from doing so by agents; and the employees watched an agent handcuff one of their colleagues and remove her from the dining room. Moreover, the period of detention—spanning multiple hours—was not "brief" and neither the owner nor anyone else informed the employees that they were free to leave or otherwise had the option to decline to answer the ICE officers' questions.

A number of courts have similarly found that employees were "seized" during workplace encounters with ICE officers under analogous circumstances where the employees were confined within the work site with armed officers guarding the exits to prohibit them from leaving. *See, e.g., Perez Cruz v. Barr*, 926 F.3d 1128, 1134 (9th Cir. 2019); *Mejia-Flores*, 2012 WL 525485,

at *8; *United States v. Bernal*, No. 8:10CR338, 2011 WL 1103360, at *9 (D.Neb. Mar. 23,

2011); *Illinois Migrant Council v. Pilliod*, 531 F.Supp. 1011, 1018–19 (N.D.Ill. 1982).

> **c.** **The I-213 forms prepared immediately following the arrests do not (with one exception) include any facts that would provide probable cause that the Liberty 12 were likely to escape before a warrant could be obtained for their arrest.**

ICE prepared I-213 forms immediately following the arrests of the Liberty 12, (*see* Dckt.

#166-16), that were submitted to the immigration court and obtained by plaintiffs.  (Dckt. #164

at 12).  Although these I-213s documented that all of the employees were foreign nationals who

are within the United States illegally, that fact—standing alone—does not provide probable

cause that the employees were likely to flee before a warrant could be obtained.  *See, e.g.*,

*Moreno v. Napolitano*, 213 F.Supp.3d 999, 1007 (N.D.Ill. 2016) ("Nor can it be the case that,

simply by being potentially removable, an alien must be deemed to be likely to evade detention

by ICE.  Such a reading would render the limitations on warrantless arrest created by 8 U.S.C.

§§1226(a) and 1357(a)(2) meaningless."); *United States v. Pacheco-Alvarez*, 227 F.Supp.3d 863,

872, 889–90 (S.D.Ohio 2016) (holding that ICE lacked reason to believe that defendant posed a

risk to escape notwithstanding his admission that he "was born in Mexico and did not have any

documentation that would allow him to reside in the United States.").

Furthermore, none of the class members' I-213 forms (except one) contains facts

establishing that the ICE officers had probable cause to believe that the employees were

reasonably likely to escape before a warrant could be obtained for their arrest.  To the contrary,

the I-213s indicated (correctly) that the employees were gainfully employed and that they

cooperated with the ICE officers by providing information about their immigration status.  These

facts weigh against a likelihood of escape.  *See, e.g.*, *Pacheco-Alvarez*, 227 F.Supp.3d at 890

(listing relevant factors); *United States v. Hernandez-Hernandez*, No. 3:18-CR-00009-GFVT,

2018 WL 6517437, at *5 (E.D.Ky. Dec. 11, 2018) (citing *Pacheco-Alvarez*); *United States v. Bautista-Ramos*, No. 18-CR-4066-LTS, 2018 WL 5726236, at *7 (N.D.Iowa Oct. 15, 2018), *report and recommendation adopted*, No. 18-CR-4066-CJW, 2018 WL 5723948 (N.D.Iowa Nov. 1, 2018). Along these lines, the I-213 of one of the employees (Nazario Tiburcio-Patricio) was conspicuously blank in the space where ICE was to describe "[t]he specific, particularized facts supporting the conclusion that the alien was likely to escape before a warrant could be obtained." (Dckt. #166-16 at 57).

The one exception is for Silvia C. Her initial I-213 reflects that she refused to identify herself when questioned by ICE, her identity was determined on the scene by analyzing her fingerprints on a mobile fingerprint scanner, and ICE determined that she had a prior expedited removal from the United States to Mexico. (Dckt. #166-18 at 45). Plaintiffs' counsel essentially acknowledged these facts at oral argument. (Dckt. #197 at 35 ("it was only after they took her ID, looked things up, that they at some point determined that she, too, had a removal order from decades ago."). As the Eighth Circuit has held, "previous removal for illegal entry establish[es] probable cause that [a foreign national] may escape before a warrant could issue," *United States v. Puebla-Zamora*, 996 F.3d 535, 538 (8th Cir. 2021), due to the prospect that the foreign national could face felony charges for Reentry of Removed Aliens pursuant to 8 U.S.C. §1326. (*See* Dckt. #166-18 at 46 (noting that an agent "advised [Silvia C.] in the Spanish language that she was being arrested for Unlawful Re-Entry After Deportation.")).

### d. The supplemental I-213 forms produced in March 2025 are immaterial to the likelihood of escape inquiry because they reflect information that the ICE agents did not know at the time they arrested the Liberty 12.

Within a week after ICE officers arrested the Liberty 12, plaintiffs' counsel learned of the arrests, notified defense counsel that they considered the arrests to be violations of the

Agreement, and requested that ICE produce the Liberty 12's I-213 forms. (Dckt. #164-15 at 8–10). ICE eventually prepared supplemental I-213 forms for the Liberty 12 on March 7, 2025, produced them to plaintiffs' counsel three days later on March 10, and it is unclear whether ICE would have prepared and produced these forms if plaintiffs had not brought the alleged violations to ICE's attention. (Dckt. ##164-15 at 1; 166-18; 197 at 46–47). In any event, ICE asserts that these supplemental I-213 forms establish that multiple members of the Liberty 12 had a likelihood of escape because: (a) four employees had I-9 forms[8] that were supported by fraudulent documents (including social security cards) related to their identity; (b) six employees had missing I-9 forms or corresponding supporting documentation; (c) one employee's I-9 form was under an alias name; and (d) another employee (Silvia C.) was found to have illegally re-entered the United States after having been previously removed. (Dckt. #173 at 32–33).

Although it may well be reasonable for ICE officers to believe that foreign nationals who are "alerted to the fact of a Social Security fraud investigation . . . would not be likely to either remain or return to his place of employment," there is no persuasive evidence that the ICE agents were actually aware of the above discrepancies with the class members' I-9 forms and supporting documentation at the time the officers arrested the Liberty 12. Indeed, although the video footage shows officers thumbing through and pulling certain file folders, just a few minutes before the first of the remaining eleven individuals was removed and handcuffed, an officer can be heard asking, "Can you ask the owner to come here and help us find [unintelligible] I-9s." (Dckt. #176 at 1:16:50). The owner never appears to return to the dining room to assist or to

---

[8] "An I-9 form is an employment eligibility verification form that all U.S. employers are required to complete and retain for each individual they hire for employment in the United States. The employer must indicate on the form that identity documents have been examined and appear to be genuine." *Mejia-Flores*, 2012 WL 525485, at *1 n.1.

bring additional documents and, shortly thereafter, ICE officers removed the remaining members of the Liberty 12 and handcuffed them.

As such, because the information regarding the I-9 forms and documentation was not known to ICE at the time of the arrests, it did not provide the required probable cause that the Liberty 12 (with the exception of Silvia C.) were likely to escape before a warrant could be obtained for their arrest. *See, e.g., Hernandez-Hernandez*, 2018 WL 6517437, at *6 (refusing to consider evidence of defendant's felony of reentry after deportation when determining whether ICE had probable cause of his likelihood of escape under §1357(a)(2) when that evidence was not known at the time of his arrest. As the Broadcast made clear, "[i]n considering 'likelihood of escape,' an ICE Officer must consider the totality of circumstances known to the officer *before* making the arrest." (Dckt. #155-1 at 18 (emphasis added) & at 19 ("Information learned post-arrest relevant to custody determination should be documented separately from the information relevant to likelihood of escape known at the time of the warrantless arrest.")).

In sum: plaintiffs have proven by a preponderance of the evidence that the Liberty 12 (with the exception of Silvia C.) were subjected to warrantless arrests in violation of the Agreement.

### 2. The claim of Senen Becerra Hernandez.

The evidence pertaining to the claim of class member Senen Becerra Hernandez ("Senen H.") is drawn from his declaration and the I-213 form prepared by ICE. In his declaration, (Dckt. #164-11), Senen H. stated that he entered the United States in October 2022 when he was paroled in by Customs and Border Patrol and has applied for Temporary Protective Status. He has a fiancé, attends church regularly, and works with a partner at his business making custom cakes and desserts. At the time of his arrest, he was renting a room in a house with three other

people. At around 6:00 p.m. on January 27, 2025, he was in his rented room when at least ten armed officers broke down the doors to the house, handcuffed him, and took him to the front of the house. When he asked why he was handcuffed, he was told that they were looking for someone who he later learned was his roommate. Officers took his identification, which he told them had his previous address. Officers never asked him for his current address or why he was at the house where they arrested him. He would have told them that he lived there if they had asked. He was handcuffed at the house for about an hour and a half before he was taken to an ICE facility for processing. He was granted bond by an immigration judge about three weeks after his arrest.

Senen H.'s I-213 form, (Dckt. #174-19), confirmed that the ICE operation was targeting his roommate, who was the subject of federal investigation in a weapons and drug trafficking raid. The form states that Senen H. confirmed that he was a foreign national who was in the United States illegally. Notably, the form further states that Senen H. stated that he was not a resident of the house, and denied that he was in possession of an ID at the time of his arrest. Finally, the form asserts that there were no known community ties for Senen H. based on ICE officers' interview with him and that the officers believed that he would escape before a I-200 warrant for his arrest "could be obtained because he was not a resident of the target residence."

When resolving any discrepancies between Senen H.'s testimony and the I-213 form, this Court is mindful of the Seventh Circuit's holding that while I-213 forms are generally considered reliable, a particular I-213 can be discounted where there is an indication that it contains information that is known to be incorrect, mischaracterizes or misstates material information, seems suspicious, or was drafted carelessly or maliciously. *See, e.g., Pouhova v. Holder*, 726 F.3d 1007, 1013 (7th Cir. 2013); *Barradas v. Holder*, 582 F.3d 754, 763 (7th Cir. 2019) (I-213

may be discounted when it "contains information that is manifestly incorrect." In this instance, the I-213 contains information that is manifestly incorrect: it reports that Senen H. denied being a resident of the house when, in fact, he was. It does not make sense that Senen H., who readily admitted to being a foreign national without legal status and to providing officers with an ID that had his prior address, would deny being a resident of the house when he was physically within his room he was renting at the time of the raid. Indeed, according to Senen H., he was never even asked whether he resided at the house.

Along these lines, there is no indication that the ICE officers asked any questions designed to determine Senen H.'s community ties even though the Broadcast required them to do so as part of their totality of the circumstances analysis. (Dckt. ##155-1 at 18; 185-2 at 3). Had they asked Senen H., they would have learned that he is a business owner who regularly attends church and has a fiancé in Chicago.

For these reasons, the Court finds that plaintiffs have shown that the ICE officers failed to comply with the requirements of the Agreement when making their warrantless arrest of Senen H.

### 3. The claim of Julio Noriega.

The parties agree that ICE did not have a warrant to arrest a United States citizen named Julio Noriega ("Julio N."); however, they vehemently disagree regarding whether he was arrested by ICE or had any contact whatsoever with ICE. In his declaration, (Dckt. #164-2), Julio N. asserts that he was walking down the street with some pizza slices when he was grabbed by several ICE officers who took his phone, wallet, and IDs, handcuffed him, and shoved him into a white van. After being driven around for one to two hours, Julio N. further asserts that he

was taken to the ICE processing center in Broadview and held there until he was released around 2:00 or 3:00 a.m.

In response, ICE submitted the declaration of Sam Olson, ICE's Chicago Field Office Director, who asserted that: (a) none of the ICE officers have any record or recollection of an encounter with Julio N., let alone making an arrest at the location and time he claims; (b) Julio N.'s name does not appear on any intake logs on the dates in question; (c) building access codes for Broadview show that the last card was swiped at 7:30 p.m. and the building was not accessed again until roughly 6:00 a.m. the following morning; and (d) the building's alarm system— which precludes anyone from being present within the building—was armed and disarmed at the above times.

Confronted with these facts, plaintiffs' reply acknowledges that Julio N.'s declaration was inaccurate regarding the assertion that he was held at Broadview and attached a brief, cryptic text exchange that mentioned that he was picked up by "ice." (Dckt. ##180 at 10 n.2; 180-2 at 2). The Court finds that Olson's declaration is more persuasive and that plaintiffs have failed to prove by a preponderance of the evidence that Julio N. was subject to a warrantless arrest in violation of the Agreement.

### B. The Claims of Class Members Whom ICE Asserts Were Arrested Pursuant to I-200 Warrants That Were Prepared at the Scene of Their Arrests.

ICE asserts that the remaining class members' claims fail because they were not subjected to warrantless arrests that are the subject of the Agreement. In particular, ICE asserts that after its officers determined that the class members were foreign nationals who were within the United States illegally, the officers arrested the class members based upon I-200 arrest warrants that they prepared after encountering the class members in the field. Plaintiffs disagree. Plaintiffs assert that these arrests are properly within the scope of the Agreement and their

motion to enforce because: (1) ICE officers have no legal authority to issue I-200 arrest warrants to foreign nationals/collaterals whom they encounter in the field; (2) arrests made pursuant to such warrants are warrantless arrests, (*see* Dckt. #164 at 26); and (3) ICE violated the Agreement by making these warrantless arrests without first finding probable cause that the class members were likely to escape before a warrant could be issued for their arrest.

The question of whether ICE officers have the legal authority to issue I-200 warrants to foreign nationals/collaterals in the field appears to be one of first impression. Indeed, according to plaintiffs, this is a new policy that has never been implemented by ICE prior to the Agreement in this case. (Dckt. #197 at 73). Neither side has cited any case law which directly addresses this issue nor has the Court uncovered any such authority through its own research. Nonetheless, the Court is compelled to answer this question to resolve plaintiffs' motion to enforce. If these I-200 warrants are invalid, as plaintiffs assert, then the arrests made pursuant to these warrants will be treated as warrantless arrests[9] that are governed by the Agreement.[10]

The Court will begin by describing how ICE is implementing its policy of issuing I-200 warrants in the field, and it will then determine whether this policy is authorized by the pertinent statutory and regulatory provisions.

---

[9] As the Seventh Circuit has held, an "arrest made pursuant to an invalid warrant" may nonetheless be a "valid arrest if probable cause justifies the arrest as though it were warrantless." *Taylor v. Henson*, 61 F.3d 906, 1995 WL 411879, at *4 (7th Cir. 1995) (citing *United States v. Fernandez-Guzman*, 577 F.2d 1093, 1098–99 (7th Cir. 1978)); *Arrington v. Rowley*, No. 3:07-CV-27-JTC, 2009 WL 10699360, at *3–4 (N.D.Ga. Mar. 12, 2009) (citing cases).

[10] Contrary to ICE's assertion at oral argument, (Dckt. #197 at 59), plaintiffs are not seeking to revise the Agreement to limit the otherwise lawful authority of ICE officers to issue I-200 warrants in the field. Instead, plaintiffs are seeking a determination as to whether ICE has the legal authority to issue such warrants in the first place. This Court has the authority to make such a determination. *See Noem v. Perdomo*, 606 U.S. __, 2025 WL 2585637, at *5 (Sept. 8, 2025) (Kavanaugh, J., concurring) (Courts "ensure, in justiciable cases, that the Executive Branch acts within the confines of the Constitution and federal statutes.").

1. **ICE's policy of issuing I-200 warrants in the field to foreign nationals/collaterals.**

In his declaration, ICE's Chicago Field Office Director Olson explained how I-200 arrest warrants were prepared in the field and issued to collaterals during Operation Safeguard 2025, which, again, was an operation conducted from January 26, 2025 through January 31, 2025, by ICE and other federal law enforcement agents in the Chicagoland area to apprehend removable foreign nationals. (Dckt. #174-1 at 4).

Prior to the onset of the operation, ICE identified targets who were amenable to immigration enforcement and ICE supervisory officers would issue I-200 warrants for the arrest of appropriate targets (presumably in conjunction with the issuance of Notices to Appear). (*Id.*). The ICE officers were then divided into arrest teams, which "included a supervisor who could issue an arrest warrant in the field if officers encountered an alien who was amenable to immigration enforcement but had not previously been identified as a target—otherwise known as a 'collateral.'" (*Id.* at 5). When ICE officers issue an I-200 warrant to a collateral, they do not look into whether the foreign national "has had a Notice to Appear issued and they do not issue Notices to Appear at that time." (*Id.*). Moreover, as acknowledged by defense counsel at oral argument, ICE officers did not serve foreign nationals with a copy of the I-200s that were prepared and issued in the field because the government would not have copies of the forms to retain in its own files.[11] (Dckt. #197 at 71).

According to plaintiffs, Thomas Homan, a former acting ICE Director during the first Trump Administration and current "Border Czar," confirmed that any undocumented foreign

---

[11] ICE's practice in this regard contradicts "ICE guidance dating to 1993 [which] called for immigration warrants to be served upon the persons sought to be detained." *United States v. Valdez-Hurtado*, 638 F.Supp.3d 879, 895 (N.D.Ill. 2022).

national could be arrested if they were near a person ICE was targeting as a priority for deportation. (Dckt. #164 at 10). Homan also reported that he was aware that collateral arrests of such persons were amongst the triple-digit arrests that were made in Chicago and other cities during Operation Safeguard 2025, and that collateral arrests would recur as immigration actions escalate across the nation. (*Id.* at 10–11). Eight of the remaining class members were arrested in the Chicagoland area during the period that Operation Safeguard 2025 was in effect.

Plaintiffs have also presented evidence that ICE is training its officers regarding the policy of issuing I-200 warrants in the field. In particular, plaintiffs submitted as an exhibit a slide from an ICE Academy training presentation which states the following:

> Officers may also carry a blank form I-200 for the arrest of each collateral so that an individual flight risk analysis is not needed.
>
> The I-200 <u>may not</u> be pre signed
>
> A supervisor needs to be available in the field to sign the I-200

(Dckt. #185-2 at 4). ICE does not dispute the authenticity of this document. (Dckt. #97 at 59–60).

### 2. Two parallel regulations (8 C.F.R. §§236.1(b) and 1236.1(b)) govern the issuance of I-200 warrants in conjunction with the issuance of Notices to Appear.

Federal law provides that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. §1226(a). The parties agree that two parallel regulations (8 C.F.R. §§236.1(b) and 1236.1(b)) expressly address the issuance of I-200 forms as follows:

> (b) Warrant of arrest—
>
> (1) In general. At the time of issuance of the notice to appear, or at any time thereafter and up to the time removal proceedings are completed, the respondent may be arrested and taken into custody under the authority of Form I-200, Warrant of Arrest. A warrant of arrest may be issued only by those immigration officers

listed in §287.5(e)(2) of 8 CFR chapter I and may be served only by those immigration officers listed in §287.5(e)(3) of 8 CFR chapter I.

(2) If, after the issuance of a warrant of arrest, a determination is made not to serve it, any officer authorized to issue such warrant may authorize its cancellation.

Courts from the Supreme Court to the Seventh Circuit to district courts around the country have accordingly recognized for decades that the authority to issue I-200 administrative warrants derives from 8 C.F.R. §§236.1(b) and 1236.1(b) or their predecessor regulation (8 C.F.R. §242.2). As the Supreme Court stated in 1960:

> The present form of the legislation giving authority to the Attorney General or his delegate to arrest aliens pending deportation proceedings under an administrative warrant, not a judicial warrant within the scope of the Fourth Amendment, is §242(a) of the Immigration and Nationality Act of 1952. 8 U.S.C. §1252(a), 8 U.S.C.A. §1252(a). The regulations under the Act delegate the authority to issue these administrative warrants to the District Directors of the I.N.S. "(a)t the commencement of any proceeding (to deport) * * * or at any time thereafter * * * whenever, in (their) * * * discretion, it appears that the arrest of the respondent is necessary or desirable." 8 CFR §242.2(a).[12]

*Abel v. United States*, 362 U.S. 217, 232 (1960); *see also Arias v. Rogers*, 676 F.2d 1139, 1143 (7th Cir. 1982) ("Suppose that at the same time, also pursuant to statute, 8 U.S.C. §1252(a), and regulation, 8 C.F.R. §242.2(a), the INS had issued warrants for the petitioners' arrest . . ."); *Dos Santos v. Meade*, No. 1:20-CV-22996, 2020 WL 6565212, at *3 (S.D.Fla. Nov. 9, 2020), *quoting* 8 C.F.R. §1236.1(b)(1) ("'At the time of issuance of the notice to appear, or at any time thereafter and up to the time removal proceedings are completed, the respondent may be arrested and taken into custody . . . [upon a] Warrant of Arrest [issuing].'"); *Maldonado v. Bostock*, No. 2:23-CV-00760-LK-BAT, 2023 WL 5804021, at *3 (W.D.Wash. Aug. 8, 2023) (same); *Florida v. United States*, 660 F.Supp.3d 1239, 1250 (N.D.Fla. 2023) (noting that "the warrant is merely a

_____

[12] The regulation formerly found at 8 C.F.R. §242.2 is now found at 8 C.F.R. §§236.1 and 1236.1. *See Salvador F.-G. v. Noem*, No. 25-CV-0243-CVE-MTS, 2025 WL 1669356, at *6 (N.D.Okla. June 12, 2025).

Form I-200 'administrative warrant' that is issued in conjunction with a notice to appear (NTA).");  *Cancino Castellar v. McAleenan*, 388 F.Supp.3d 1218, 1224 (S.D.Cal. 2019) ("DHS regulations authorize an immigration officer to formally arrest and take the alien into custody pursuant to a Form I-200 Warrant of Arrest at the time an NTA is issued.");  *Kambro v. Poppell*, No. SA-07-CV-800-XR, 2007 WL 3051601, at *1 n.3 (W.D.Tex. Oct. 18, 2007) (same).

Consistent with language of 8 C.F.R. §§236.1(b) and 1236.1(b) and the straightforward interpretation that the courts have given to them, the latest version of ICE's "Immigration Detainer—Notice of Action" form (revised effective May 2025), states that:

> DHS officers are authorized to arrest a removable alien under the immigration laws pursuant to an administrative warrant pending a decision on whether they will be removed from the United States, under 8 U.S.C. §1226(a) and 8 C.F.R. §236.1(b), or pending removal, under 8 C.F.R. §241.2(a)(1), and may arrest removable aliens under certain circumstances without a warrant pursuant to 8 U.S.C. §1357(a). Under no circumstances is a judicial warrant required for the arrest of an alien under the immigration laws.

(Dckt. #187-4 at 3).  The linkage between the issuance of a NTA and the I-200 arrest warrant is further confirmed by the fact that "[t]he cancellation of a notice to appear also cancels any outstanding warrants issued by the Attorney General for the alien's arrest."  *Saqr*, 580 F.3d at 422 (cleaned up).

### 3. The two regulations that ICE relies on (8 C.F.R. §§287.5 and 287.8) do not provide ICE officers with lawful authority to issue I-200 warrants to collaterals in the field.

Although ICE acknowledges 8 C.F.R. §§236.1(b) and 1236.1(b) expressly address the issuance of I-200 warrants, ICE asserts there is "nothing in the INA or implementing regulations prohibits an officer duly authorized by 8 C.F.R. §287.5 to issue an I-200 from doing so immediately upon identifying an alien who is present unlawfully within the United States." (Dckt. #173 at 12).  In other words, according to ICE, ICE officers have the authority to issue I-

200 arrest warrants whenever and wherever they choose to do so except as expressly prohibited by the governing statute or implementing regulations. (*Id.* ("§236.1(b)(1) simply provides *one possible* avenue for establishing probable cause sufficient to issue an arrest warrant in compliance with 8 C.F.R. §287.8(c)(2)(i).")).

ICE cites no authority in support of this assertion, and it is contrary to law. As the *Maldonado* court held, the fact that "Section 236.1(b) states that certain immigration officers have authority to issue and serve a Form I-200 arrest warrant '[a]t the time of issuance of the notice to appear, or at any time thereafter and up to the time the removal proceedings are completed,' . . . does *not* mean that DHS may trigger Section 1226(a) *any time and in any circumstance . . . by issuing an arrest warrant*." *Maldonado*, 2023 WL 5804021, at *3, *quoting* 8 C.F.R. §236.1(b) (emphasis added).

The *Maldonado* decision is consistent with well-settled law that rejects the proposition that agencies charged with the duty to effectuate statutory and regulatory schemes have unlimited authority to act unless they are expressly constrained by the statute and regulations. Instead, an agency has authority to act only to the extent that it is authorized to do so by the governing statute and regulations. *See, e.g., Ryan, LLC v. Fed. Trade Comm'n*, 746 F.Supp.3d 369, 387 (N.D.Tex. 2024) ("Agencies do not have unlimited power to accomplish their policy preferences until Congress stops them; they have only the powers that Congress grants through a textual commitment of authority.") (cleaned up); *Merck & Co. v. United States Dep't of Health & Hum. Servs.*, 385 F.Supp.3d 81, 93 (D.D.C. 2019), *aff'd*, 962 F.3d 531 (D.C.Cir. 2020) ("Nor does the absence of an express limitation of authority establish HHS's capacity to act. . . . Were courts to *presume* a delegation of power absent an express *withholding* of such power, agencies

would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron*, *Mead*, and quite likely with the Constitution as well.") (cleaned up).

Furthermore, the two regulatory provisions that ICE cites (namely, 8 C.F.R. §§287.5 and 287.8(c)(2)(i)) do not discuss the circumstances under which ICE may issue an I-200 warrant. Section 287.5(e)(2) identifies the type of ICE officers who are authorized to issue I-200 arrest warrants but it does not speak to the timing or circumstances under which such warrants can be issued by these officers. Similarly, Section 287.8(c)(2)(i) does not address the issuance of warrants but instead provides that "[a]n arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States." Nor does Section 287.8(c)(2)(ii) address the *issuance* of warrants; instead, it provides that "[a] warrant of arrest shall be *obtained* except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained." (emphasis added). The words "issue" and "obtain" are not synonymous. To the contrary, they represent opposite sides of a transaction. (For example, a corporation *issues* stock that an investor *obtains*.) In sum: there is no text within either Section 287.5 or Section 287.8 that provides ICE officers the authority to prepare and issue I-200 warrants to collaterals they encounter in the field.

The Court rejects ICE's invitation to interpret these regulations in a manner that would provide ICE with the legal authority to pursue its policy of issuing I-200 warrants to collaterals in the field. This is so because such a policy would largely (if not entirely) negate 8 U.S.C. §1357(a)(2), which provides ICE officers with the authority to arrest without a warrant any foreign national with probable cause that the person is in the United States in violation of any immigration law and "is likely to escape before a warrant can be obtained for his arrest." The

Seventh Circuit has made clear that Section 1357(a)(2)'s likelihood of escape limitation "is always seriously applied," *United States v. Cantu*, 519 F.2d 494, 496–97 (7th Cir. 1975), and courts have held that "'[t]he flight-risk determination is not mere verbiage.'" *Bautista-Ramos*, 2018 WL 5726236, at *8, *quoting Pacheco-Alvarez*, 227 F.Supp.3d at 889.

The importance of the probable cause requirements of Section 1357(a)(2) is further heightened by ICE's embrace of the standard of reasonable suspicion articulated by the concurring opinion in the *Noem v. Perdomo* case. *See* 606 U.S. ___, 2025 WL 2585637, at *1–5 (2025) (Kavanaugh, J., concurring). (*See* Dckt. #208 at 3–4 (discussing the *Perdomo* concurrence)). In *Perdomo*, the district court temporarily enjoined ICE from stopping individuals based solely on four factors (namely, their apparent race or ethnicity; whether they spoke Spanish or English with an accent; the type of location at which they were found; and the type of job that they appeared to work) on the ground that these four factors, even when taken together, could not satisfy the Fourth Amendment's requirement of reasonable suspicion. *See Perdomo*, 606 U.S. ___, 2025 WL 2585637, at *6 (Sotomayor, J., dissenting). The Supreme Court (by a six to three vote) granted the Government's application for a stay of the district court's temporary restraining order without a majority opinion but with a concurrence and a dissent joined by three Justices. The concurring opinion states that although "apparent ethnicity alone cannot furnish reasonable suspicion[] under this Court's case law regarding immigration stops . . . it can be a 'relevant factor' when considered along with other salient factors" such as the other three factors listed above. *Id.*, at *3 (Kavanaugh, J., concurring).

Citizens, non-citizens with legal status, and foreign nationals are interwoven throughout ICE's Chicago Area of Responsibility and American society in general. Citizens and non-citizens with legal status who share commonalities (such as race/ethnicity, a preference for

speaking Spanish, or employment in certain occupations or locations) with—or mere physical proximity to—Latino foreign nationals may now find themselves more likely to be subjected to ICE questioning for sometimes lengthy periods of detention,[13] and, potentially, warrantless arrests during immigration enforcement operations.  *See Perdomo*, 606 U.S. __, 2025 WL 2585637, at *6, *9, *14 ("United States citizens are also being seized, taken from their jobs, and prevented from working to support themselves and their families.") (Sotomayor, J., dissenting); (Dckt. #205 at 3–4 (outlining plaintiffs' allegation that two citizens were amongst the five persons arrested during a September 25, 2025 immigration enforcement operation at a home in Cicero)).

---

[13] Case in point: at approximately 1:00 a.m. on September 30, 2025, roughly three hundred ICE officers and personnel from other law enforcement agencies with support by Black Hawk helicopters conducted an immigration enforcement action at an apartment building in the predominately African-American South Shore neighborhood in Chicago.  The building was reportedly targeted because it was known to be frequented by members of Tren de Aragua (a Venezuelan gang) and their associates.  *See* Rebekah Riess, Bill Kirkos, *37 People Arrested and American Kids Separated From Parents After ICE Raid at Chicago Apartments*, CNN, Oct. 3, 2025 ("10/3/25 CNN Article").  According to news accounts:

> Armed federal agents in military fatigues busted down their doors overnight pulling men, women and children from their apartments, some of them naked, residents and witnesses said.  Agents approached or entered nearly every apartment in the five-story building, and U.S. citizens were among those detained for hours.

Cindy Hernandez, *Massive Immigration Raid on Chicago Apartment Building Leaves Residents Reeling: "I feel defeated,"* CHICAGO SUN TIMES, Oct. 1, 2025; *see also* 10/3/25 CNN Article (quoting an eyewitness who observed that the majority of those who were handcuffed outside were Black residents).  ICE arrested thirty-seven foreign nationals (mostly Venezuelans but also Mexicans, Nigerians, and Columbians) including two believed to be members of Tren de Aragua for immigration violations and alleged involvement in drug trafficking and weapons crimes.  *Id.*

Many details of the raid (such as the number of warrantless, collateral arrests that were made and whether any individuals targeted in advance of the raid were arrested) remain unknown.  However, one thing seems clear:  ICE rousted American citizens from their apartments during the middle of the night and detained them—in zip ties no less—for far longer than the "brief" period authorized by the operative regulation (8 C.F.R. §287.8(b)(2)) and envisioned by the *Perdomo* concurrence.  *Perdomo*, 606 U.S. __, 2025 WL 2585637, at *3 (Kavanaugh, J., concurring) ("[R]easonable suspicion means only that immigration officers may briefly stop the individual and inquire about immigration status.  If the person is a U.S. citizen or otherwise lawfully in the United States, that individual will be free to go after the brief encounter.").

Adherence to the Seventh Circuit's direction to "seriously appl[y]" the probable cause requirements of Section 1357(a)(2), *Cantu*, 519 F.2d at 497, will help protect citizens and other persons with legal status who face questioning by ICE officers against being subjected to prolonged detentions and warrantless, collateral arrests.

Notwithstanding the recognized importance of Section 1357(a)(2)'s likelihood of escape limitation, the *expressly* stated purpose of ICE's policy of issuing I-200s in the field—per ICE's own training materials—is to allow ICE officers to *avoid* making individual flight risk analyses before arresting the collaterals. (*See* Dckt. #185-2 at 4 ("Officers may also carry a blank form I-200 for the arrest of each collateral so that an individual flight analysis is not needed."). Given that each ICE arrest team includes a supervisor who can issue an I-200, (Dckt. #174-1 at 5), ICE will be able to entirely circumvent the requirements of Section 1357(a)(2) so long as it issues a sufficient number of blank I-200 forms to each team.

Courts do not interpret regulations in a fashion that would render related statutory text superfluous, and this Court will not do so here. *See, e.g., Petco Petroleum Corp. v. Nat. Gas Pipeline Co. of Am.*, 410 F.Supp.2d 715, 722 (S.D.Ill. 2006) (rejecting interpretation of a regulation that would render the Natural Gas Pipeline Safety Act's "procedural safeguards superfluous."); *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) ("the canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme."); *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1078 (7th Cir. 2013) ("we do not construe regulations in such a way as to render other provisions of the regulations meaningless or superfluous."); *United States v. Roberts*, No. 3:24-CR-137, 2025 WL 1699184, at *17 n.14 (E.D.Va. June 16, 2025) ("If a reading of the statutory text would render another portion of the text superfluous, then that interpretation is to be avoided.").

**4. ICE's remaining arguments in support of its claim that it has authority to issue I-200s to collaterals in the field are meritless.**

ICE offers two more arguments in support of its policy of issuing I-200 warrants to collaterals in the field. First, ICE asserts that construing the regulations to mean that I-200 warrants can "only issue concurrently or after the issuance of an NTA" as provided in 8 C.F.R. §§236.1(b) and 1236.1(b) would render another regulation (namely, 8 C.F.R. §287.8(c)(2)(i)) superfluous. (Dckt. #173 at 12–13). However, Section 287.8(c)(2)(i), which provides that "[a]n arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States," is in no way negated or rendered superfluous by linking the issuance of I-200 warrants to the concurrent or prior issuance of an NTA. To be clear, an ICE officer can arrest a foreign national *without* an I-200 warrant consistent with Section 287.8(c)(2)(i) so long as the officer has probable cause that the person is in the United States in violation of any immigration law and is likely to escape before a warrant can be obtained for his arrest. *See* 8 U.S.C. §1357(a)(2); 8 C.F.R. §287.8(c)(2)(i).

Finally, ICE asserts that *its* understanding of its own regulations is "evidenced within the Form I-200 (Rev 9/16) itself, which provides *five* different checkboxes for immigration officials to indicate how they 'determined that there is probable cause to believe that [an individual] is removable from the United States." (Dckt. #173 at 13). On its face, the I-200 form makes no reference to the procedure by which it is supposed to be issued and thus, as such, does not even purport to authorize ICE's practice of issuing I-200 forms to collaterals in the field. In any event, an agency cannot expand the scope of its statutory and regulatory authority through the expedient of creating a form that purports to do so.

34

5. **The arrests made pursuant to the invalid I-200 warrants are warrantless arrests that were not (with one exception) made in compliance with the Agreement.**

For the reasons explained in the preceding sections, ICE lacked statutory and regulatory authority to engage in its policy of issuing I-200 warrants to collaterals in the field without the concurrent or prior issuance of an NTA. Thus, the I-200 warrants issued in the field for the following class members are therefore invalid: Jhony Ariel Godov Gregorio; Marco Trulio Godov Gregorio; Jose Octavio Ortega Gonzalez; Bernandino Randa Marinas; Abel Orozco Ortega; Jocknuel Hernandez Rojas; Heriberto Jara Caxba; Selvin Caal Bolon; and Jose Caal Bolon.[14] Consequently, the Court will treat the arrests of these class members as warrantless arrests. *Taylor*, 61 F.3d 906, 1995 WL 411879, at *4; *Fernandez-Guzman*, 577 F.2d at 1098–99; *Arrington*, 2009 WL 10699360, at *3–4.

As such, plaintiffs have the burden of proving a violation of the Agreement by showing that ICE failed to provide sufficient credible information in these class members' I-213s to establish that ICE had probable cause at the time of their arrest that they were likely to escape before a warrant for their arrest could be obtained. In making this determination, courts consider a number of factors that were known by ICE officers at the time of the arrest, including whether the foreign national: (1) was arrested near his home; (2) lacked a known criminal history at the time of his arrest; (3) answered questions posed to him by ICE without incident or evasion; (4) was working in the area; (5) had a stable residence with a spouse, fiancé, and children; (6) had children or other family with proper immigration status; (7) was linked to altered identity documents; (8) had past attempts to flee; and (9) lacked ties to the community, such as family, home, or a job. *Pacheco-Alvarez*, 227 F.Supp.3d at 890; *Moreno*, 213 F.Supp.3d at 1007–08;

---

[14] In light of finding that these class members' I-200 warrants are invalid, the Court need not address plaintiffs' alternative argument that these class members were subjected to a warrantless arrest because they were already under arrest before their I-200s warrants were prepared and executed on the scene.

*Hernandez-Hernandez*, 2018 WL 6517437, at *5; *Bautista-Ramos*, 2018 WL 5726236, at *7;

*Pearl Meadows Mushroom Farm, Inc. v. Nelson*, 723 F.Supp. 432, 449 (N.D.Cal. 1989).

The evidence regarding each of these class members is as follows:

**Jhony Ariel Godov Gregario ("Jhony G."):**

Jhony G.'s I-213 reflects that he acknowledged that he was a foreign national and it

contains information that reflects his ties to the community and weighs against the likelihood of

escape, including that he is married and has a minor child who is a U.S. citizen and that he had

worked at the same job for the past ten years. (Dckt. #174-5 at 4–5). On the other hand, there is

no information within his I-213 that would support a finding of probable cause that he was likely

to escape before a warrant could be obtained for his arrest. Accordingly, the Court finds that

Jhony G. was subjected to a warrantless arrest in violation of the Agreement.

**Marco Trulio Godov Gregario ("Marco G."):**

Marco G.'s I-213 reflects that he acknowledged that he was a foreign national, but

contains no information that sheds any light on his ties to the community or weighs against or in

favor of a finding that he would have been likely to escape before a warrant could be obtained

for his arrest. (Dckt. #174-7). As such, there is no information within his I-213 that would

support a finding of probable cause that he was likely to escape before a warrant could be

obtained for his arrest. Accordingly, the Court finds that Marco G. was subjected to a

warrantless arrest in violation of the Agreement.

**Jose Octavio Ortega Gonzalez ("Jose G."):**

Jose G's I-213 reflects that he acknowledged that he was a foreign national; he had

entered the United States illegally and lived here for twenty-one years; he is married and has

three children who are United States citizens; and that he had a ten-year-old conviction for

driving a motor vehicle without a license. (Dckt. #174-10 at 3–4). These facts do not constitute probable cause that he would have been likely to escape before a warrant could be obtained for his arrest. (Dckt. #174-7). Accordingly, the Court finds that Jose G. was subjected to a warrantless arrest in violation of the Agreement.

**Bernadino Randa Marinas ("Bernadino M."):**

Bernadino M.'s I-213 reflects that he acknowledged that he was a foreign national who entered the United States illegally; he had convictions for three traffic-related offenses over the past eleven years; he had been issued an NTA that was issued in June 2017 but was terminated in February 2020; and that he has a mother, wife, and two children (one of whom is a minor) who are here with him in Chicago. (Dckt. #174-12 at 3–4). ICE, who admits that Bernadino M. was arrested on the way to work, does not assert that the information in his I-213 provides probable cause that Bernadino M. was likely to escape before a warrant could be obtained for his arrest, (Dckt. #173 at 28), and the Court finds that the information is insufficient to do so. Accordingly, the Court finds that Bernadino M. was subjected to a warrantless arrest in violation of the Agreement.

**Abel Orozco Ortega ("Abel O."):**

Abel O.'s I-213 form reflects that ICE officers learned during the course of his detention for questioning that he had previously been removed from the United States in 2004 and was potentially in violation of 8 U.S.C. §1326, Reentry of Removed Aliens, which is a federal criminal felony offense. (Dckt. #174-14 at 3–4). As noted above, "previous removal for illegal entry establish[es] probable cause that [a foreign national] may escape before a warrant could issue." *Puebla-Zamora*, 996 F.3d at 538. Accordingly, probable cause is established by the I-

37

213 and plaintiffs' claim that Abel O. was subjected to a warrantless arrest in violation of the Agreement fails.

**Jocknuel Hernandez Rojas ("Jocknuel R."):**

Jocknuel R.'s I-213 reflects that he acknowledged that he was a foreign national who entered the United States illegally; he was arrested in his residence; he was previously served with an NTA that was dismissed in December 2023; he is single with no children; and he works a job in construction. (Dckt. #174-18 at 4–5). This information does not support a finding of probable cause that he was likely to escape before a warrant could be obtained for his arrest. Accordingly, the Court finds that Jocknuel R. was subjected to a warrantless arrest in violation of the Agreement.

**Heriberto Jara Caxba ("Heriberto C."):**

Heriberto C.'s I-213 reflects that he acknowledged that he was a foreign national who entered the United States illegally; he was arrested in his residence; and that he has no criminal history. (Dckt. #187-3 at 3–4). This information does not support a finding of probable cause that he was likely to escape before a warrant could be obtained for his arrest. Accordingly, the Court finds that Heriberto C. was subjected to a warrantless arrest in violation of the Agreement.

**Selvin Caal Bolon ("Selvin B."):**

Selvin B.'s I-213 reflects that he acknowledged that he was a foreign national who entered the United States illegally; a mobile fingerprint scanner confirmed his identity; he was arrested outside of his residence; he was issued an NTA in June 2021 that was never served on him; lists his occupation as student; and that he has no criminal history. (Dckt. #187-5 at 2–3). This information does not support a finding of probable cause that he was likely to escape before

a warrant could be obtained for his arrest. Accordingly, the Court finds that Selvin B. was subjected to a warrantless arrest in violation of the Agreement.

**Jose Caal Bolon ("Jose B."):**

Jose B.'s I-213 reflects that he acknowledged that he was a foreign national who entered the United States illegally; a mobile fingerprint scanner confirmed his identity; he was arrested outside of his residence; lists his occupation as laborer; that he has no criminal history; and that he "will be released and placed on Alternatives to Detention (ADT)." (Dckt. #187-6 at 2–3). This information does not support a finding of probable cause that he was likely to escape before a warrant could be obtained for his arrest. Accordingly, the Court finds that Jose B. was subjected to a warrantless arrest in violation of the Agreement.

**C. The claim of Sergio Bolanos Remero.**

ICE arrested Sergio Bolanos Remero ("Sergio R.") at 8:00 a.m. on January 26, 2025 during a traffic stop about three blocks from his home while he was on the way to work. (Dckt. #165-5 at 1). ICE asserts that it issued an I-200 to Sergio R. at the scene of his arrest based on a reference to such a warrant in his I-213; however, ICE has not produced a copy of the I-200 to plaintiffs, and it apparently does not have a copy of the warrant in its files. (Dckt. #197 at 28–29). Per his declaration, (Dckt. #164-5 at 1–2), Sergio R. was never shown an I-200 and plaintiffs assert that he was subjected to a warrantless arrest. The Court agrees.

As an initial matter, even if an I-200 for Sergio R. had been produced, it would have been declared invalid for the reasons stated above in Section VI(B). Moreover, ICE's failure to make the "light lift" of producing a copy of the I-200 warrant it supposedly issued to Sergio R. is evidence that the warrant does not exist. *See Rodrigues De Oliveira v. Joyce*, No. 2:25-cv-00291-LEW, 2025 WL 1826118, at *4 (D.Me. July 2, 2025) (declining to credit the declaration

of an ICE Assistant Field Office Director, who swore that an I-200 warrant existed and was served on petitioner, where the government failed to make the "light lift" of producing the warrant to be part of the record); *see also Chung Young Chew v. Boyd*, 309 F.2d 857, 863 (9th Cir. 1962) (holding that the failure to introduce the arrest warrant into evidence was "a fatal flaw in the proceedings leading to entry of the deportation order under review."). Finally, the fact that Sergio R.'s I-213 indicates that an I-200 was issued to him does not compel a contrary conclusion. The record contains evidence of at least one other example where a class member's I-213 stated that an I-200 was issued to him even though ICE admits that the class member was subjected to a warrantless arrest. (*Compare* Dckt. #166-16 at 50 (Gustavo Robles-Lopez's I-213 indicating that he was arrested pursuant to an I-200) *with* Dckt. #197 at 44 (admitting that the Liberty 12, of which Robles-Lopez was a member, were subjected to warrantless arrests)).

For these reasons, Sergio R. was subject to a warrantless arrest. Plaintiffs therefore have the burden of proving a violation of the Agreement by showing that ICE failed to provide sufficient credible information in his I-213 to establish that ICE had probable cause at the time of his arrest that he was likely to escape before a warrant for his arrest could be obtained.

Sergio R.'s I-213 reflects that he acknowledged that he was a foreign national who entered the United States illegally; he was arrested near his residence; he resides with a girlfriend; and he has no criminal history. (Dckt. #174-9 at 3–4). His I-213 also reflects that he told ICE officers that he had no children who were U.S. citizens and that he was unemployed. Sergio R. contradicts these statements in his declaration, (Dckt. #164-5 at 1), where he indicated that he has a child who is a U.S. citizen and is employed. The Court finds that Sergio R.'s declaration is more credible on these points, and it discounts the I-213 statements to the contrary. *See Barradas*, 582 F.3d at 763 (I-213 containing "manifestly incorrect" information may be

40

discounted). There is no apparent reason why Sergio R. would deny that he had a child when he indisputably mentioned to ICE that he lives with his girlfriend, who is the mother of his child. There is also no apparent reason why he would deny having a job when he was stopped on his way to work.

For these reasons, the Court finds that the information in Sergio R.'s I-213 does not support a finding of probable cause that he was likely to escape before a warrant could be obtained for his arrest. Accordingly, the Court finds that Sergio R. was subjected to a warrantless arrest in violation of the Agreement.

### D. The claim of Raul Lopez Garcia.

ICE arrested Raul Lopez Garcia ("Raul G.") at approximately 5:00 a.m. at his residence pursuant to an I-200 warrant. (Dckt. #164-9 at 2–3; Dckt. #174-16 at 3). The parties dispute whether Raul G.'s arrest was a targeted arrest based on an I-200 warrant that was issued the date before his apprehension (January 27, 2025) or a collateral arrest based on an I-200 warrant that was issued in the field on the date he was apprehended (January 28, 2025).

In his declaration, Field Office Director Olson stated that ICE was assisting the U.S. Marshals Service in the execution of a warrant for a parole violator when it learned of Raul G.'s presence and his amenability to immigration enforcement after it ran a records check on the address of the parole violator. (Dckt. #174-1 at 7). ICE thereafter used an electronic system to issue an I-200 for Raul G. on January 27, 2025. Officers then accessed the warrant in their electronic system on January 28, 2025 and printed it prior to going out on the operation to target both the parole violator and Raul G. at the target address. (*Id.*). Raul G.'s I-200 contains his typed name and the typed date of January 28, 2025. (Dckt. #174-17 at 2). Olson explained that

the I-200 had the date of January 28 despite its issuance on January 27 because officers electronically accessed and printed the warrant on January 28. (Dckt. 174-1 at 7).

Plaintiffs first assert that Raul G.'s arrest was not a targeted arrest and that his I-200 was not, in fact, created on January 27 because it is dated January 28. However, the Court finds that Olson's explanation for the apparent date discrepancy to be persuasive. Plaintiffs further assert that the I-200 is insufficient to identify Raul G. and is therefore invalid because it does not include Raul G.'s "file number" (i.e., alien registration number or "A number"), which is a unique multi-digit number assigned by U.S. Citizenship and Immigration Services to non-United States citizens for tracking their immigration cases and records. (Dckt. #181 at 15–16) (citing *Powe v. City of Chicago*, 664 F.2d 639 (7th Cir. 1981)). However, *Powe* holds that "an arrest warrant must truly name (the arrestee) or describe him sufficiently to identify him" and Raul G.'s I-200 *does* state his correct name. *Id.* at 646 (cleaned up). Plaintiffs have cited no authority in support of their assertion that an I-200 which accurately states a foreign national's name must also state his A number to be valid.

For these reasons, the Court finds that Raul G. was subjected to a targeted arrest based on an I-200 that was issued prior to the date of his apprehension. As such, the manner in which he was arrested did not violate the Agreement.

### E. Remedies for the Violations of the Agreement.

As discussed above, plaintiffs have established that twenty-two of the twenty-six claimant class members are entitled to relief because they were subjected to warrantless arrests in violation of the Agreement. Since these class members have been released on bond and are no longer in the custody of ICE, the Agreement provides "ICE shall promptly reimburse all bond payments and lift any imposed conditions of release." (Dckt. #155-1 at 9). The Court orders

42

ICE to comply with this remedial provision of the Agreement for each of the twenty-two prevailing class members and to thereafter file a certificate of compliance with the Court within ten business days of the entry of this Memorandum Opinion and Order (by October 22, 2025).[15]

The Agreement further provides that:

> In cases where a warrantless arrest is made contrary to the terms of this Agreement, the relevant field officer's supervisors shall take remedial measures to ensure that the officer(s) involved complies with ICE policy as outlined in this Agreement, which may include ensuring the officer(s) involved receives remedial training. As soon as practicable, ICE shall inform Plaintiffs (via Defendants' Counsel) that remedial measures and/or training were implemented.

(Dckt. #155-1 at 10). Pursuant to this provision, the Court orders ICE to provide a copy of the Broadcast Statement of Policy, (*id.* at 18–20), to each of its officers who was involved in one (or more) of the warrantless arrests of the prevailing class members; to obtain a certificate from each officer that he or she has received and reviewed the Broadcast; and to file a certification of compliance with this Court within fifteen business days of the entry of this Memorandum Opinion and Order (by October 29, 2025).

Finally, plaintiffs seek an award of their reasonable attorney's fees and costs under the Agreement, which provides that "Plaintiffs' Counsel shall also be entitled to reasonable attorneys' fees and costs for any successful Motion to enforce filed pursuant to Section V.C. of th[e] Agreement if the Court finds that Defendants' position was not substantially justified." (Dckt. #155-1 at 12; Dckt. #164 at 36). The Court grants plaintiffs' request for two reasons.

First, ICE failed to respond to plaintiffs' request for fees and costs in its response brief and has therefore waived any objection to plaintiffs' request. *See, e.g.*, *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.").

---

[15] The Court is aware that the federal government is largely shutdown. However, there is no indication that the shutdown has had any impact whatsoever on the operations of ICE.

Second, the Court finds that ICE's opposition to plaintiffs' motion to enforce was not substantially justified because it lacked a reasonable basis in fact and/or law. *See Pable v. Chicago Transit Auth.*, 145 F.4th 712, 724 (7th Cir. 2025) (to establish substantial justification, a party must show that "its opposition had a reasonable basis in law and fact."). In brief, ICE's opposition to the claims of the Liberty 12 (with one exception) lacked a reasonable basis in fact because the I-213s that the ICE officers initially prepared following the arrests utterly lacked any facts to establish probable cause that the class members were likely to escape before a warrant could be obtained for their arrest. Furthermore, ICE's defense to the arrests that were based on the I-200 warrants that were created and issued on the scene of the class members' arrests lacked a reasonable basis in law because ICE lacks statutory and regulatory authority to issue I-200s in this fashion.

Plaintiffs' counsel are ordered to submit documentation regarding the reasonable attorney's fees and costs that they have incurred in connection with prosecuting plaintiffs' motion to enforce within ten business days of the entry of this Memorandum Opinion and Order (by October 22, 2025). The parties are thereafter ordered to meet and confer pursuant to Northern District of Illinois Local Rule 54.3 in an effort to reach agreement on plaintiffs' fee claim. If the parties are unable to resolve their dispute, plaintiffs are granted leave to file a petition to recover their reasonable attorney's fees and costs.

## VII. PLAINTIFFS' MOTION TO MODIFY THE AGREEMENT

The parties acknowledge that the Agreement is a consent decree, allowing the Court to incorporate its terms into the final approval order and to judicially enforce them. (Dckt. #197 at 7–8); *see Holmes v. Godinez*, 991 F.3d 775, 780 (7th Cir. 2021); *United States v. Alshabkhoun*, 277 F.3d 930, 934 (7th Cir. 2002). Moreover, the parties agree that the Agreement's "intended

purpose" is to "ensur[e] that immigration officers perform warrantless arrests only when they have probable cause as to the individual's unlawful presence and likelihood of escape." (Dckt. ##184 at 12; 185 at 5). Plaintiffs move to modify the Agreement pursuant to Federal Rule of Civil Procedure 60(b)(5) on the grounds that changed circumstances caused by ICE's actions have frustrated the purpose of the Agreement and that a modification of the Agreement is necessary to provide plaintiffs with the benefit of the bargain that they negotiated for when they agreed to settle their claims in this case.

Under Rule 60(b)(5), a consent decree, in the court's discretion, "may be modified if 'it is no longer equitable that the judgment should have prospective application.'" *United States v. Krilich*, 303 F.3d 784, 789 (7th Cir. 2002), *quoting* Fed.R.Civ.P. 60(b)(5).

> In interpreting this clause of Rule 60(b)(5), the Supreme Court has set forth a two-part test to determine whether modification is warranted. *Rufo [v. Inmates of Suffolk Co. Jail*, 502 U.S. 367, 383 (1992)]. Under that test, a party seeking to modify a Consent Decree "bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Id.* A party may meet the initial burden of establishing a significant change in circumstances "by showing a significant change either in factual conditions or in law." *Id.* at 384 . . . . If the moving party meets this initial burden, "the court should consider whether the proposed modification is suitably tailored to the changed circumstance." *Id.*

*Krilich*, 303 F.3d at 789–90. It is well-settled—as ICE concedes—that substantial non-compliance with the terms of a consent decree constitutes a significant change in circumstances that can justify the modification of the decree. (Dckt. #184 at 13); *see, e.g.*, *Kelly v. Wengler*, 822 F.3d 1085, 1098 (9th Cir. 2016); *Lab./Cmty. Strategy Ctr. v. Los Angeles Cnty. Metro. Transp. Auth.*, 564 F.3d 1115, 1120–21 (9th Cir. 2009); *Thompson v. U.S. Dept. Of Hous. & Urb. Dev.*, 404 F.3d 821, 828 (4th Cir. 2005); *David C. v. Leavitt*, 242 F.3d 1206, 1211–12 (10th Cir. 2001).

45

**A. Plaintiffs have established a significant change in circumstances that warrants the modification of the Agreement.**

Plaintiffs acknowledge that "things were more or less going fine" under the Agreement during the first two-and-one-half years of the Agreement's three-year term as the parties were able to confer and resolve any disputes. (Dckt. #197 at 49–50). However, plaintiffs assert that starting in late January 2025, with the onset of Operation Safeguard 2025, ICE failed to substantially comply with the Agreement by utilizing its 1-200 policy regarding the issuance of I-200s in the field to effectuate the collateral arrests of several claimant class members and other foreign nationals. Plaintiffs further assert that ICE ceased its compliance with the Agreement *in toto* on June 11, 2025, when ICE's Principal Legal Advisor, Charles Wall, sent an email to all ICE employees with the subject line: "Termination of the Castanon-Nava Settlement Agreement" and text stating that:

> Despite a pending motion to enforce the settlement agreement and a motion to extend the settlement agreement, it remains terminated. Accordingly, I hereby rescind the May 27, 2022, Castanon-Nava Settlement Obligation statement of policy.

(Dckt. #193 at 1).

In its response, ICE contends that its policy regarding the issuance of I-200s in the field is lawful, but that argument has already been rejected the Court. *Supra* at Section IV.B. Next, ICE asserts that plaintiffs have failed to show that ICE is no longer complying with the training and reporting obligations under the Agreement. (Dckt. #184 at 13). However, Wall's email is unequivocal: per his dictate, the Agreement and the Broadcast were terminated and rescinded, period. The only logical reading of Wall's email is that all obligations under the Agreement, including those for training and reporting, stopped. What's more, ICE admits that it is no longer complying with the Agreement's requirement that its officers document probable cause of the

likelihood of escape when warrantless arrests are made and this documentation requirement—per plaintiffs—is a critically important component of the Agreement. (Dckt. #197 at 66–67, 69).

Finally, ICE asserts that because plaintiffs generally "anticipated" its non-compliance with the Agreement, "it does not matter that [p]laintiffs did not anticipate specifically *how* they now allege [d]efendants violated the Agreement." (Dckt. #184 at 14). Consequently—per ICE—the evidence of its substantial non-compliance cannot support a modification of the Agreement. (Dckt. #184 at 14–16). While it is true that a "modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree," the events that a moving party relies upon to support a modification must have been *actually anticipated* by that party. *Rufo*, 502 U.S. at 385; *Thompson*, 404 F.3d at 828; *David C.*, 242 F.3d at 1212–13. As such, *how* ICE violated the Agreement is important. Events that were "theoretically foreseeable"—but which plaintiffs did *not* actually foresee—*can* support a modification. *Thompson*, 404 F.3d at 828.

There is no doubt that plaintiffs, in fact, anticipated that ICE might violate the Agreement—they negotiated provisions that provide for motions to enforce the Agreement based on allegations of individual violations and based on repeated, material violations. They also negotiated remedial provisions in the event that such violations of the Agreement were established. However, plaintiffs assert that they did not actually foresee that ICE would implement its new I-200 policy and the Court finds their argument persuasive.

As noted above, ICE's policy of issuing I-200 warrants to foreign nationals in the field was *explicitly* designed "so that an individual flight risk analysis is not needed" for foreign nationals who are subject to collateral arrests. (Dckt. #185-2 at 4). As such, ICE's policy is intended to, and does, circumvent the Broadcast's requirement that "ICE officers must document

the facts and circumstances surrounding a warrantless arrest in the narrative section of the foreign national's I-213 form as soon as practicable." (Dckt. #155-1 at 19). There would be no reason for plaintiffs to actually foresee that ICE would implement such a policy. To the contrary, ICE *agreed* as part of the Agreement not to "take any . . . actions, that change or undermine the warrantless arrest or vehicle stop policies described in the Broadcast." (*Id.* at 6). Furthermore, ICE (to plaintiffs' knowledge) had never before implemented this I-200 policy, and only did so after the Agreement in this case was entered. For these reasons, the Court finds no basis to support ICE's suggestion that plaintiffs actually foresaw that ICE would pursue a policy that would eviscerate the very foundation of the Agreement that they spent well over a year negotiating.

Plaintiffs also assert that they did not actually foresee that a high-ranking ICE official (namely, Principal Legal Advisor Charles Wall) would send an agency-wide directive that terminated and rescinded the Agreement and Broadcast while the Agreement was still in effect. Once more, the Court is persuaded by plaintiffs' argument. As explained above in Section V, the Agreement was clearly in effect during the pendency of plaintiffs' motion to enforce for "allegations of repeated, material violations" yet Wall issued his declaration despite his knowledge that plaintiffs' motion to enforce was pending.

It defies logic to believe that plaintiffs would have given up their claims and entered into the Agreement if they had actually foreseen that ICE would unilaterally and prematurely terminate the Agreement at the whim of one of its officials. *See, e.g.*, *Thompson*, 404 F.3d at 828–29 ("If the parties had actually anticipated that the Local Defendants would be so far behind on their obligations at this stage in the proceedings, the Consent Decree would never have been executed. The Plaintiffs would not have given up their claims in exchange for an agreement that

they anticipated would not be followed"); *David C.*, 242 F.3d at 1213 ("Utah's arguments

notwithstanding, it would defy logic for Appellees to agree to include the four-year Termination

Provision in the Agreement if they actually foresaw that Utah would not be in substantial

compliance with the terms of the Agreement at the end of the four-year period."); *New York v.*

*Microsoft Corp.*, 531 F.Supp.2d 141, 169 (D.D.C. 2008) (citing *Thompson* and *David C.*).

Accordingly, the Court finds that plaintiffs have established a significant change in

circumstances that warrants the modification of the Agreement.

**B. The Court will extend the duration of the Agreement to provide plaintiffs with the relief they bargained for when they entered into the Agreement.**

"The failure of substantial compliance with the terms of a consent decree can qualify as a

significant change in circumstances that would justify the decree's temporal extension."

*Lab./Cmty. Strategy Ctr.*, 564 F.3d at 1120–21; *Kelly*, 822 F.3d at 1098 (affirming the court's

extension of the settlement agreement where it "returned Plaintiffs to the position they would

have occupied had CCA not violated the agreement from its inception."); *Holland v. New Jersey*

*Dep't of Corr.*, 246 F.3d 267, 284 (3d Cir. 2001) ("Courts have extended a decree or parts of a

decree when a change in circumstances thwarted the basic purpose and intent of the decree, . . .

when there had been pervasive violations of the decree by one party, . . . and when one party was

in substantial non-compliance with the decree.") (cleaned up); *Duvall v. Moore*, No. CV MJM-

94-2541, 2024 WL 4529261, at *6–8 (D.Md. Oct. 18, 2024) (modifying consent decree by

extending its term due to "a significant and unanticipated degree of noncompliance"); *Jud.*

*Watch, Inc. v. Adams*, 485 F.Supp.3d 831, 842–43 (E.D.Ky. 2020) (extended consent decree to

enable plaintiffs to monitor a second removal period as the parties had agreed); *Dep't of Fair*

*Emp. & Hous. v. L. Sch. Admission Council Inc.*, No. 12-CV-01830-JCS, 2018 WL 1156605, at

*25 (N.D.Cal. Mar. 5, 2018) (where a party has failed to comply with a consent decree,

49

extending the term of the decree for the amount of time that the party has failed to comply will return the moving party to the position it would have had but for the non-compliance).

Plaintiffs urge the Court to modify the Agreement by extending it for an additional three-year period based upon ICE's substantial non-compliance with Agreement. (Dckt. ##177 at 12; 197 at 74). ICE asserts that plaintiffs' request to extend the Agreement by a three-year period is not narrowly tailored to the changed factual circumstances that plaintiffs identified, (Dckt. #184 at 16–20), although defense counsel acknowledged at oral argument that it might be appropriate for the Court to extend the Agreement for some period if there were proof that ICE stopped performing the Agreement prior to its expiration, (Dckt. #197 at 87–88).

The Court agrees, in part, with both parties. Although an extension of the Agreement is necessary here to put plaintiffs in the position that they would have been in absent ICE's material non-compliance with the Agreement, plaintiffs' request to extend the Agreement by three more years is not suitably tailored to address such non-compliance. To reiterate, ICE was in substantial compliance with the Agreement for two-and-one-half years until it unequivocally ceased compliance, evidenced by Wall's June 11, 2025 agency-wide email. To remedy this non-compliance, the Court will extend the Agreement by 118 days, the number of days between June 11, 2025 and the date this Memorandum Opinion and Order is published (October 7, 2025). As one court has recognized, the "[m]odification of a court order is suitably tailored to the changed circumstance when it would return both parties as nearly as possible to where they would have been absent the changed circumstances, and extending the term of a consent decree by the amount of time that a party failed to comply with the decree meets that standard." *Dep't of Fair Emp. & Hous.*, 2018 WL 1156605, at *17 (cleaned up).

Accordingly, the Court extends the Agreement until February 2, 2026. The Court further orders ICE to reissue the Broadcast to all ICE officers nationwide, (*see* Dckt. #155-1 at 6), with the instruction that the Broadcast shall remain in effect through February 2, 2026 per this Court's Order. This element of relief will correct for ICE's premature cancellation of the Broadcast on June 11, 2025.

Finally, it is the Court's understanding that ICE's Operation Management Module ("OM[2]") will enable it to produce to plaintiffs the relevant information about warrantless arrests and arrests that were made pursuant to administrative warrants (i.e., I-200s) not issued in conjunction with NTAs. (*See* Dckt. #197 at 53–56); *see also Kidd v. Mayorkas*, 343 F.R.D. 428, 438 (C.D.Cal. 2023) (citing to a spreadsheet of arrest statistics produced from ICE's OM[2] database). The Court therefore orders ICE to produce to plaintiffs the A numbers of the foreign nationals and corresponding I-213s and I-200s for all foreign nations who were subjected to all such arrests that took place in the Northern District of Illinois[16] from June 11, 2025 through October 7, 2025 within ten business days of the entry of this Memorandum Opinion and Order (by October 22, 2025). ICE shall thereafter continue to produce data regarding such arrests to plaintiffs on the first day of each month between October 22, 2025 and when the Agreement expires on February 2, 2026.

ICE shall file a certification of compliance regarding its reissuance of the Broadcast and reporting of past arrests within ten business days of the entry of this Memorandum Opinion and Order (by October 22, 2025).

---

[16] Although plaintiffs seek to have data reported for the ICE's entire Chicago Area of Responsibility, the Court notes that the parties' agreed to limit ICE's reporting obligations to the Northern District of Illinois, (Dckt. #155-1 at 8), and the Court will retain the parties' geographic limitation on ICE's reporting obligation. Furthermore, to be clear, ICE is *not* required to produce information and records for arrests related to foreign nationals who have been transferred from state and local custody to federal custody, or who have prior orders of removal or warrants of removal. (Dckt. ##185 at 16; 197 at 54).

## VIII.   PROCEDURE FOR RESOLVING ADDITIONAL ALLEGED VIOLATIONS OF THE AGREEMENT

Within ten business days of the entry of this Memorandum Opinion and Order (by October 22, 2025), plaintiffs shall provide defense counsel with all available information regarding all alleged violations of the Agreement raised plaintiffs' "notice of additional violations of consent decree and request for status conference" and "supplemental notice of consent decree violations."  (Dckt. ##199, 205).  The parties are thereafter ordered to meet and confer in good faith to resolve the alleged violations consistent with the rulings in this decision. The parties shall file a joint status report regarding the status of their efforts to resolve these alleged violations of the Agreement by November 5, 2025.

### CONCLUSION

For the reasons stated above, plaintiffs' motion to enforce court order regarding settlement agreement, (Dckt. #164), is granted in part and denied in part and plaintiffs' motion to modify the final approval order enforcing the terms of settlement, (Dckt. #177), is granted on the terms stated in this Opinion.  This matter is set for an in-court status hearing on November 12, 2025 at 11:00 a.m.

**Date: October 7, 2025**

**Jeffrey I. Cummings**
**United States District Court Judge**