IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARGARITO CASTAÑON NAVA, et al., | ) ) ) | |
| Plaintiffs, | ) ) | No. 18-cv-3757 |
| v. | ) ) ) | Judge Jeffrey I. Cummings |
| DEPARTMENT OF HOMELAND SECURITY, et al., | ) ) ) ) | |
| Defendants. | ) | |

**ORDER**

Motion hearing held on plaintiffs' motion for placement of potential class members on alternatives to detention, (Dckt. #219). For the reasons stated on the record in open court, and summarized in part below, the Court grants plaintiffs' cross-motion in part and orders as follows.

To begin, in the parties' joint status reports filed on November 7, 2025, the parties report that they have agreed—after an examination of the pertinent arrest records—that 46 class members were arrested in violation of the terms of the Consent Decree and are thus entitled to relief under the Decree. (Dckt. #244 at 3–4). However, the majority of these class members have already been removed from the United States, either involuntarily or voluntarily, and only 13 of these class members remain in detention. After meeting and conferring as to the identity of these individuals, by 12:00 p.m. on November 14, 2025, defendants shall release these 13 individuals whom the parties agree were arrested in violation of the Consent Decree, remain in custody, and who are therefore subject to release "on their own recognizance without bond or conditions of release" pursuant to Section V(E)(2) of the Consent Decree. The Court stays the involuntary removal and removal for voluntary departure for these individuals until the next

business day after their release from custody. This will ensure that the class members can obtain the benefit of the relief provided by the Consent Decree before they are potentially removed from the United States.

More broadly, in their October 29, 2025 submission, (Dckt. #232), defendants represented that they were able to provide plaintiffs with the name, A-number, country of origin, and date of arrest for the approximately 3,000 individuals arrested from approximately June 11, 2025 through approximately October 7, 2025 (including those arrested in connection with Operation Midway Blitz). After a review of the pertinent records, defendants determined that approximately 615 of these individuals "are not subject to mandatory detention and do not have final orders of removal." (Dckt. #232 at 3; Dckt. #246 at 3). Defendants' submission further stated that "ICE defines mandatory detention as aliens with final orders, aliens detained under 8 U.S.C. §1226(c), and aliens processed for expedited removal." (Dckt. #232 at 3 n.1).

The Consent Decree, in Section IV(E)(3)(a), provides that class members are not entitled to relief under the Decree if they are "subject to mandatory detention pursuant to the Immigration and Nationality Act." Plaintiffs assert that these 615 individuals (and the other foreign nationals who have been arrested and are detained) should be released on bond and ICE's Alternatives to Detention (ATD) program so long as they are not subject to mandatory detention under Section 1226(c). Defendants disagree and assert that *all* foreign nationals who have been arrested and are detained are subject to mandatory detention under Section 8 U.S.C. §1225(b)(2) even if they are not subject to mandatory detention under Section 1226(c). This Court construes the provisions of the Consent Decree in its discretion given its familiarity with the parties' protracted negotiations that led to the formation of the Decree and its role in resolving disputes

over the Decree's administration. *See, e.g., F.T.C. v. Trudeau*, 579 F.3d 754, 763 n.9 (7th Cir. 2009).

As stated in open court, this Court recently addressed the issue of whether Section 1226 or Section 1225 governs foreign nationals who are similarly situated to the foreign nationals who have been arrested in connection with Operation Midway Blitz. In that decision, this Court determined that the foreign nationals in question were subject to arrest and detention under Section 1226, and not under Section 1225. *See Patel v. Crowley*, No. 25-cv-11180, 2025 WL 2996787 (N.D.Ill. Oct. 24, 2025). The Court's holding to this effect is consistent with the decisions of every one of the 21 district judges in this District who have ruled on this issue as well as with the decisions of well over 100 other district judges from around the country. *See, e.g.*, *Berto Mendez v. Noem*, No. 2:25-CV-02062-RFB-MDC, 2025 WL 3124285, at *2 (D.Nev. Nov. 7, 2025) (citing Kyle Cheney, More than 100 judges have ruled against the Trump admin's mandatory detention policy, Politico (Oct. 31, 2025 at 4:29 p.m. EDT) https://www.politico.com/news/2025/10/31/trump-administration-mandatory-detention-deportation-00632086 (last visited November 12, 2025). This Court will stand by its ruling on this issue until it receives contrary direction from the Seventh Circuit or the Supreme Court.

Section V(B)(2) of the Consent Decree allows the Court "to provide any equitable remedies not otherwise specified" in the Decree upon proof of "repeated, material violations." The Court finds, as it has found previously, *see Castanon Nava v. Department of Homeland Security*, No. 18-cv-3757, 2025 WL 2842146 (N.D.Ill. Oct. 7, 2025), that the 46 agreed upon violations of the Consent Decree discussed above constitute "repeated, material violations."

Plaintiffs argue that the Court should, in its discretion, grant them the equitable relief they seek. The Court agrees for the following reasons:

3

First, plaintiffs assert that a large number of class members (including many of the 615 in question) were arrested in violation of the terms of the Consent Decree. Given the number of instances where the parties have agreed that the rights of class members were violated, it stands to reason that a significant number of additional violations will be uncovered as plaintiffs receive and analyze the arrest records of the remaining arrestees.

Second, the Court finds that granting the 615 class members (or more precisely, the subset of the 615 who are still detained and who do not pose a risk of danger) release on bond and ICE's ATD program is reasonably necessary to preserve the possibility of them receiving relief under the Consent Decree if the parties agree, or plaintiffs prove, that they were arrested in violation of the Decree. Plaintiffs have offered evidence that numerous class members whose rights under the Consent Decree were violated and who would have been eligible for release under the Decree were removed, often by voluntary departure, before such relief could be provided to them. Indeed, only 13 of the 46 (or 28%) of the class members whom the parties agree were arrested in violation of the terms of the Consent Decree remain in ICE detention. And, overall, an estimated 60% of those who have been arrested under Operation Midway Blitz have been removed from the United States. Plaintiffs assert that many class members are choosing to voluntarily depart to escape the unsafe and unsanitary conditions that they have been subjected to while in ICE detention. Their argument is supported by a ruling in another case in this District in which the plaintiff detainees have been granted injunctive relief to avoid the irreparable harm that they have suffered and will be likely to suffer on account of the abominable conditions that they were subjected to in the ICE facility in Broadview Illinois. *See Moreno Gonzalez v. Noem*, No. 25 C 13323, Dckt. # 49, Temporary Restraining Order (N.D.Ill. Nov. 5, 2025).

4

Third, ICE has a recognized and successful ATD program that has been in widespread use with over 179,000 participants and which is intended to "enable[] aliens to remain in their communities – contributing to their families and community organizations and, as appropriate concluding their affairs in the U.S. – as they move through immigration proceedings or prepare for departure." *See* https://www.ice.gov/features/atd (last visited November 12, 2025).

Fourth, class members who are released from detention on bond and enrolled in the ATD program will still be in the "custody" of ICE, and the Court has the discretion to release them under these conditions. In addition to the decisions cited in open court, *see Just. Of Bos. Mun. Ct. v. Lydon*, 466 U.S. 294, 301 (1984); *Vargas v. Swan*, 854 F.2d 1028, 1033 (7th Cir. 1988); and *Duran v. Elrod*, 713 F.2d 292, 297–98 (7th Cir. 1983), the Court relies on the following additional authority: *Clements v. Fla.*, 59 F.4th 1204, 1213-14 (11th Cir.), *cert. denied*, 144 S.Ct. 488 (2023) ("We have said that the 'in custody' requirement should be construed 'very liberally,' . . . To that end, we have held that non-citizens released on supervision while awaiting a final decision in their immigration proceedings are deemed to be 'in custody' for purposes of habeas corpus.") (cleaned up); *Ayesh v. U.S. Immigr. & Customs Enf't*, No. 08 C 542, 2008 WL 4442633, at *2 n.3 (N.D.Ill. Sept. 26, 2008) (finding that petitioner who had been released on a bond by an Immigration Judge was in "custody" for purposes of a habeas corpus claim). Moreover, no individual who is deemed a "high public safety risk" by defendants will be released from detention under the terms of this Order.

Finally, the Court's decision to allow the release of these class members on bond under the ATD program is consistent with the manner in which the class members would have been treated at the time the Consent Decree was executed in November 2021. As explained in *Patel*, until mid-2025, the Department of Homeland Security (DHS) had consistently applied the

provisions of Section 1226(a) and its discretionary release and review of detention to the vast majority of foreign nationals allegedly in this country without valid documentation. *Patel v. Crowley*, 2025 WL 2996787, at *4. However, in mid-2025, DHS issued an internal memorandum advising ICE employees that DHS was changing its approach and would now treat foreign nationals who had previously been considered to have been detained under Section 1226 as instead being detained under Section 1225, which requires mandatory detention. *Id.*

Defendants' recent and abrupt 180º change in their interpretation of the INA, which is inconsistent with the manner in which the Supreme Court and the Bureau of Immigration Appeals itself had been treating foreign nationals under Section 1226, *id.* at *6, was unforeseeable at the time the Consent Decree was executed. Indeed, if plaintiffs had known that defendants would take the position that *all* foreign nationals who are arrested for alleged violations of the immigration laws are subject to mandatory detention under Section 1225, they never would have entered into the Consent Decree as it is currently written because class members are entitled to relief under the Decree only if they are *not* subject to mandatory detention. As such, construing the Consent Decree (a contract) to subject all class members to mandatory detention under Section 1225 would violate principles of contract interpretation by nullifying the Decree's remedial provision. *See, e.g., In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F.Supp.2d 511, 660 (S.D.Tex. 2003) ("Under federal common law, . . . one part of a writing should not be construed to nullify another; a contract should be interpreted as a whole, and its provision should be read to give effect to and harmonize all where possible."); *Romspen Mortg. Ltd. P'ship v. BGC Holdings LLC – Arlington Place One*, 20 F.4th 359, 373 (7th Cir. 2021) ("We do not interpret a contract in a manner that would nullify or render provisions meaningless.") (cleaned up).

For these reasons, the Court will exercise its discretion to grant equitable relief under the Consent Decree. To this end, by 12:00 p.m. CST on November 14, 2025, with respect to the subset of 615 individuals discussed on the record, defendants shall provide the Court with their names and specify which of the individuals in this group have been identified by defendants as posing a "high public safety risk" if they were released. The Court further orders each individual within this group who is still detained and who does not have a "high public safety risk" designation to be released from detention upon payment of the $1,500 bond specified by 8 U.S.C. §1226(a)(2)(1) and their enrollment in ICE's ATD program. To reiterate, as stated on the record in open court, the Court will not release from detention any foreign national who has been designated by the government as a "high public safety risk." The Court stays its order releasing these individuals from detention until 12:00 p.m. CST on November 21, 2025. The Court also stays the involuntary removal and removal for voluntary departure for these individuals until the next business day after their release from custody.

If the parties later agree, or plaintiffs prove, that any of the individuals who have been released on ATD and bond were subject to arrest in violation of the Consent Decree, they will be released "on their own recognizance without bond or conditions of release" pursuant to Section V(E)(2) of the Consent Decree.

By November 19, 2025, defendants shall provide plaintiffs' counsel with the names and threat levels (i.e., risk of public safety and flight risk) of the remaining approximately 3,000 to 3,300 individuals who have been arrested since June 11, 2025, through the present, inclusive of those arrested in connection with Operation Midway Blitz, so that the parties can continue to meet and confer regarding those individuals.

7

Finally, by November 24, 2025, the parties shall file a joint status report regarding compliance with this Order and the parties' continued efforts to meet and confer regarding the remaining foreign nationals who have been arrested and are referenced herein.

## CONCLUSION

For all of these reasons, plaintiffs' cross-motion for placement of potential class members on alternatives to detention is granted to the extent specified herein and is otherwise denied.

**Date: November 13, 2025**

**Jeffrey I. Cummings**
**United States District Court Judge**