**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MARGARITO CASTAÑON NAVA, et al.,** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | **No. 18-cv-3757** |
| | ) | |
| **v.** | ) | **Judge Jeffrey I. Cummings** |
| | ) | |
| **DEPARTMENT OF HOMELAND SECURITY, et al.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>ORDER</u>

Defendants filed an emergency motion to stay this Court's October 7, 2025 and November 13, 2025 orders, (Dckt. ##214, 247), pending appeal. For the reasons stated below, defendants' motion, (Dckt. #249), is denied.

## I.    Background

In 2018, five individual plaintiffs and two organizational plaintiffs filed this class action lawsuit against defendants, including the Department of Homeland Security ("DHS") and the U.S. Immigration and Customs Enforcement ("ICE"),[1] to ensure that ICE complies with its statutory obligations under 8 U.S.C. §1357(a)(2) ("Section 1357(a)(2)") when conducting warrantless arrests of persons who have not obtained lawful immigration or citizenship status in

---

[1] Plaintiffs also named Kristi Noem (Secretary of DHS), Todd Lyons (Acting Director of ICE), and Sam Olson (Acting Field Office Director of the ICE Chicago Field Office) as defendants in this lawsuit. (Dckt. #164). For purposes of this Order, the Court will refer to defendants collectively as "ICE" unless otherwise noted.

the United States.[2]  After a settlement conference and protracted follow-up negotiations, the parties agreed to settle this case.

The Court thereafter certified a settlement class and granted final approval of the parties' settlement agreement (the "Agreement") on February 8, 2022.  (*See* Dckt. ##155-1; 214 at 44 (noting the parties' acknowledgment that the court-approved Agreement is a consent decree)).  The Agreement imposed several obligations on ICE related to warrantless arrests of persons for a civil violation of U.S. immigration laws within ICE's Chicago Area of Responsibility (Illinois, Indiana, Wisconsin, Missouri, Kentucky, and Kansas).  In particular, the parties agreed that a Broadcast Statement of Policy ("Broadcast") would be issued to all ICE officers nationwide.  (Dckt. #155-1 at 6, 18–20).  The Broadcast, which states the underlying laws and polices applicable to all arrests effected under Section 1357(a)(2), requires, among other things, that ICE officers "document the facts and circumstances surrounding [a] warrantless arrest in the narrative section of the alien's I-213 as soon as practicable."  (*Id.* at 18–19).  Class members whose rights were violated under the Agreement were eligible for relief so long as they were not "subject to mandatory detention pursuant to the Immigration and Nationality Act (INA)."  (*Id.* at 9).  The Agreement had a three-year term that was set to expire on May 12, 2025, unless enforcement provisions within the Agreement triggered its extension.  (*Id.* at 5).

During the first two-and-one-half years of the Agreement's term, the parties were able to resolve all disputes concerning compliance with the Agreement.  However, shortly after the second Trump Administration began in late January 2025, plaintiffs' counsel received multiple reports from class members alleging that ICE agents arrested them without warrants in violation

---

[2] This Court will use the term "foreign national" as equivalent to the statutory term "alien" within the Immigration and Nationality Act.  *See* 8 U.S.C. §1101(a)(3) (defining "alien" as "any person not a citizen or national of the United States.").

of the Agreement and the governing law (Section 1357(a)(2)).[3]  After trying to resolve their disputes with ICE, without success, plaintiffs filed a motion to enforce the Court's order regarding the parties' Agreement and a separate motion pursuant to Rule 60(b) to modify the final approval order enforcing the terms of the Agreement.  (Dckt. ##164, 177).

In its October 7, 2025 Memorandum Opinion and Order ("Opinion"), the Court granted plaintiffs' motions and: (a) found that plaintiffs showed by a preponderance of the evidence that ICE engaged in "repeated, material violations" of the Agreement by arresting twenty-one out of the twenty-five claimant class members without a warrant in violation of the Agreement and the requirements of Section 1357(a)(2); (b) ordered ICE to provide relief to those individuals under the terms of the Agreement[4] and to pay plaintiffs attorney's fees and costs; (c) found that plaintiffs met their burden under Rule 60(b)(5) of showing that a modification of the Agreement was warranted because ICE had failed to substantially comply with its terms; (d) modified the Agreement to extend its term until February 2, 2026 in order to compensate for the time period that ICE was indisputably out of compliance with the Agreement and provide plaintiffs with the

---

[3] 8 U.S.C. §1357(a)(2) provides in pertinent part that:

(a)  Powers without warrant

Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant - -

(2) to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States[.]

[4] Since the class members who were entitled to relief had already been released on bond, their relief under the Agreement consisted of a refund of their bond and vacation of their conditions of release.  (Dckt. #155-1 at 9).

full three-year term of the Agreement that the parties agreed to; and (e) adjusted the reporting requirements imposed on ICE to better ensure that plaintiffs could track ICE's compliance with the Agreement. (Dckt. #214 at 4).

Separately, on or about September 7, 2025, ICE began a significant immigration enforcement action known as Operation Midway Blitz in the ICE's Chicago Area of Responsibility. ICE officers thereafter intensified their efforts and began arresting hundreds of foreign nationals. On October 17, 2025, ICE filed a motion to extend an upcoming reporting deadline imposed by the Opinion. (Dckt. ##216, 217). Plaintiffs responded by bringing a cross-motion to place all potential class members identified by the parties prior to October 7, 2025 on an ankle monitor or another Alternative to Detention ("ATD") pending the resolution of potential violations concerning the class members. (Dckt. #219). The Court granted ICE's motion for an extension of the reporting deadline, ordered ICE to submit reports of its arrest-related materials on a rolling basis and to respond to plaintiffs' cross-motion, and ordered the parties to confer regarding potential violations of the Agreement identified by plaintiffs and the relief sought by plaintiffs in their cross-motion. (Dckt. #222).

On November 7, 2025, the parties reported their agreement—after an examination of the pertinent arrest records—that forty-six class members had been arrested in violation of terms of the Agreement but that thirty-three of these class members had already been removed from the United States, either involuntarily or voluntarily, and that only thirteen of them (or 28%) remained in ICE detention. (Dckt. #247 at 1). ICE further reported that it was able to provide plaintiffs with identifying information for approximately 3,000 foreign nationals who were arrested from approximately June 11, 2025 through approximately October 7, 2025, and that it had determined that approximately 615 of these individuals "are not subject to mandatory

detention and do not have final orders of removal." (*Id.* at 2; Dckt. #232 at 3 n.1 (noting that "ICE defines mandatory detention as aliens with final orders, aliens detained under 8 U.S.C. §1226(c), and aliens processed for expedited removal.")).

The Court held a hearing on November 12, 2025 to address the status of ICE's reporting of the arrest-related information for potential class members and plaintiffs' cross-motion for placement of potential class members on ATD. (*See* Dckt. #260 (Nov.12, 2025 Hr'g Tr.)). At that time, plaintiffs argued, among other things, that as many as 60% of the potential class members who had been arrested had already been removed from the United States without receiving relief under the Agreement. (Dckt. ##260 at 19; 247 at 4). According to plaintiffs, many of the class members simply gave up and chose to voluntarily remove themselves to escape the unsafe and unsanitary conditions that they were subject to while in ICE detention. (Dckt. #247 at 4). Plaintiffs further argued that interim relief was necessary to reduce the possibility that class members whose rights were, in fact, violated during the course of their arrests would be removed (either involuntarily or voluntarily) from the United States prior to receiving the relief that they were entitled to under the Agreement.

In its ruling on November 12 and its follow-up written order of November 13, 2025, the Court: (a) ordered the thirteen class members whom the parties agreed had their rights violated under the Agreement be promptly released from detention; (b) determined that ICE had engaged in "repeated, material violations" of the Agreement as evidenced by the forty-six class members whom the parties agreed suffered a violation of their rights when they were arrested; (c) resolved the parties' dispute over whether the class members were subject to mandatory detention under the INA—and thereby ineligible for relief under the Agreement—by holding that potential class members were not subject to mandatory detention under 8 U.S.C. §1225(b)(2) but were instead

detained under 8 U.S.C. §1226(a) and eligible for relief so long as they were not subject to mandatory detention under 8 U.S.C. §1226(c); and (d) in the exercise of its "discretion to provide any equitable remedies otherwise specified in the Agreement," (Dckt. #155-1 at 11), ordered ICE to release from detention under ICE's own ATD program (upon payment of a $1,500 bond[5]) the foreign nationals in the group of 615 who are still in the United States and who are not deemed by ICE to be a "high public safety risk" pending a determination as to whether they are entitled to relief under the Agreement.  (Dckt. ##247, 260).  The Court stayed the release of the prospective class members in this latter group until noon on November 21, 2025, and further stayed the involuntary removal for voluntary departure for these individuals until the next business day after their release from detention.  (Dckt. #247 at 7).

With respect to the prospective class members who were to be potentially released from detention, the Court implored defense counsel to identify any foreign national whom ICE determined should not be released due to posing a high public safety risk or, more broadly, "too high a risk to be released," and it emphasized that it would not release any such person from detention.  (Dckt. #260 at 25–26, 30).  The Court further made clear that it was not going to second-guess ICE's criteria for determining which of the foreign nationals would pose a high public safety risk.  (*Id.* at 30–31).  ICE subsequently filed a notice of compliance and supplemental notice of compliance to identify those individuals within the group of 615 who were deemed to be a "high public safety risk" if they were to be released.  (Dckt. ##255, 256).  Upon analysis of the notices, ICE has identified fifty-seven individuals who fall within the category of a "high public safety risk" due to their criminal record or for some other unspecified reasons.  (*Id.*).  In addition, the notices reflect that seventy-five of the individuals have been

---

[5] *See* 8 U.S.C. §1226(a)(1)(A).

removed from the United States; thirty-three of the individuals have been released from detention by being bonded out through an order from an immigration judge, receiving other relief from an immigration judge, paroled, or released on their own recognizance; and that approximately 442 individuals are eligible for release from detention on ATD pending payment of bond as specified by the Court. (*Id.*).

## II.     Standard for Obtaining a Stay Pending Appeal

As the Supreme Court has held, "[a] stay is not a matter of right, even if irreparable injury might otherwise result. . . . It is instead an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (cleaned up). Furthermore, "[a]n applicant for a stay must meet a heavy burden of showing not only that the judgment of the lower court was erroneous on the merits, but also that the applicant will suffer irreparable injury if the judgment is not stayed pending his appeal." *Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315, 1316 (1983) (Blackmun, J., in chambers) (cleaned up). These "legal principles have been distilled into consideration of four factors: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434 (cleaned up). "[A] district court's conclusion that a stay is unwarranted is entitled to considerable deference." *Ruckelshaus*, 463 U.S. at 1316.

## III.    ICE Has Failed to Make a Showing of Irreparable Injury

The Court begins with this factor because both the Supreme Court and Seventh Circuit have made clear that a stay application will be denied absent a showing of irreparable injury. *See, e.g.*, *Ruckelshaus*, 463 U.S. at 1317 ("An applicant's likelihood of success on the merits

7

need not be considered, however, if the applicant fails to show irreparable injury from the denial of the stay."); *Classic Components Supply, Inc. v. Mitsubishi Elecs. Am., Inc.*, 841 F.2d 163, 164 (7th Cir. 1988) ("One who seeks an injunction pending appeal must show irreparable injury."); *Robbins v. Pepsi-Cola Metro. Bottling Co.*, 800 F.2d 641, 643–44 (7th Cir. 1986) ("[W]e need not decide whether the MPPAAA has 'repealed' Rule 62(c) and the "All Writs Act' in interim liability cases because PepsiCo has not demonstrated that it would suffer irreparable injury absent a stay, and is therefore not entitled to one anyway.").

To begin, ICE's unexplained five-week delay in filing its appeal and seeking a stay of the Court's October 7, 2025 decision undermines its claim that it will suffer irreparable harm absent a stay. *See, e.g.*, *Maryland v. King*, 567 U.S. 1301, 1303–04 (2012) (Roberts, C.J., in chambers) (noting that an opponent's objection that an applicant's "eight-week delay in applying for a stay undermines its allegation of irreparable harm" was a "sound point[].");  *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011) (indicating a lengthy, unexplained delay in seeking relief calls into question "how urgent the need for equitable relief really is.");  *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 903 (7th Cir. 2001) ("[D]elay in pursuing [injunctive relief] may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if [injunctive relief] is not entered.").  This is particularly true where, as here, the party seeking injunctive relief has "knowledge of the pending nature of the alleged irreparable harm."  *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F.Supp.3d 87, 90 (D.D.C. 2014) (cleaned up).

Furthermore, ICE's motion briefly mentions "irreparable injury" in vague terms in three places in its sixteen-page motion.  First, ICE asserts that the Court's ruling that its officers lack the legal authority under the governing statute and regulations to issue I-200 arrest warrants to "collaterals" (namely, foreign nationals whom the officers encounter in the field and who were

not targeted for arrest) raises a legal question "that must be answered on appeal before irreparable harm to the Government occurs." (Dckt. #249 at 2–3). But ICE does not explain how the Court's ruling to this effect creates any harm, let alone irreparable injury. ICE officers can still arrest foreign nationals whom they encounter in the field even if they lack an arrest warrant pursuant to Section 1357(a)(2) if they have probable cause to believe that the person is a foreign national who might flee before an arrest warrant can be obtained. (Dckt. #214 at 17). Moreover, even arrests made with an invalid I-200 warrant can be valid arrests if the criteria for warrantless arrest under Section 1357(a)(2) are satisfied. (*Id.* at 37–38).

Next, ICE asserts that "the Government suffers irreparable harm when its polices are enjoined—including when, as here, a court substantially impairs agency operations that impact public safety and retroactively applies a decision to agency action." (Dckt. #249 at 4). However, ICE has failed to identify any ICE policy that the Court has enjoined, and it has further failed to explain how the Court's orders have "substantially impair[ed] agency operations." To be clear, the Court has not ordered ICE to cease its immigration enforcement, and it has not in any manner stopped ICE officers from effectuating the arrest of foreign nationals. Indeed, ICE officers have effectuated over 3,000 arrests during Operation Midway Blitz and ICE has provided no evidence that the Court's October 7, 2025 Opinion slowed down its enforcement actions. Moreover, the Court has not enjoined the removal proceedings for class members and the brief stay on removal for the sub-set of the 615 class members who are ordered to be released from detention on ATD upon payment of bond will expire one day after they are released.[6]

Finally, ICE's suggestion that it will suffer irreparable harm on account of court-imposed "limitations placed on agency operations to prioritize stricter enforcement of immigration laws

---

[6] For these reasons, the cases that ICE relies on are distinguishable. (*See* Dckt. #249 at 13 (citing cases)).

enacted by Congress," (Dckt. #249 at 13), is unsupported by the nature of the orders that ICE challenges. The Court is mindful that it "does not sit in a position of making any policy for the government" and it has placed no limitations on agency operations other than to enforce the Agreement that ICE *voluntarily* entered into. (Dckt. #260 at 31). This is not irreparable harm. Consequently, "because [ICE] has not reached first base on irreparable injury," its motion for a stay fails and should be denied. *Classic Components*, 841 F.2d at 165.

## IV.    ICE Has Failed to Show a Likelihood of Success

The Seventh Circuit has further recognized that before a stay should issue, "the applicant must make a strong showing that [it] is likely to succeed on the merits." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020) (citing *Nken*, 556 U.S. at 434). In the interests of not unnecessarily lengthening this order, to reach its conclusion that ICE has failed to show a likelihood of success, the Court relies on the analyses contained in its Opinion (Dckt. #214), its oral ruling at the November 12, 2025 hearing and the related November 13, 2025 Order (Dckt. ##260, 247), and its prior opinion in *Patel v. Crowley*, No. 25 C 11180, 2025 WL 2996787 (N.D.Ill. Oct. 24, 2025),[7] which addressed the issue of which provision of the INA (either Section 1226 or Section 1225(b)) governs the detention of the class members in this case. The Court further agrees with the analysis in plaintiffs' opposition brief as to why ICE lacks a likelihood of success regarding why this Court's orders are not barred by 8 U.S.C. §1252(f)(1). (Dckt. #259 at 4–7).

The Court adds one additional point which pertains to ICE's argument that Section 1225(b) rather than Section 1226 governs the terms of the class members' detention. ICE cites to the decision in *Maldonado v. Bostock*, No. 2:23-CV-00760-LK-BAT, 2023 WL 5804021, at *3

---

[7] *See also Soto-Garcia v. Olson*, No. 25-CV-13736, 2025 WL 3204594 (N.D.Ill. Nov. 17, 2025); *Melisio v. Crowley*, No. 25-cv-13291, Dckt. #9 (N.D.Ill. Nov. 17, 2025).

(W.D.Wash. Aug. 8, 2023), for the proposition that it is prohibited to use Notices to Appear ("NTAs") and I-200 arrest warrants in situations where individuals are subject to mandatory detention under Section 1225(b) to convert the authority to detain the individual to Section 1226(a). (Dckt. #249 at 7). It is similarly impermissible for ICE to use I-200 warrants and NTAs issued under the authority of Section 1226(a) to arrest foreign nationals and then to convert the authority to detain those individuals to Section 1225(b)(2). *See Patel*, 2025 WL 2996787, at * 5–6 (citing cases). Yet, this is precisely what ICE is purporting to do with the class members in this case.

## IV.     The Balance of the Equities Favors Plaintiffs

Given that ICE has failed to make a showing of irreparable injury and a substantial likelihood of success on the merits and that plaintiffs have established the prospect of injury and the possible deprivation of the relief to which they are entitled under the Agreement (*see* Dckt. #259 at 13–15), the balance of equities weighs in plaintiffs' favor.

### CONCLUSION

For all of these reasons, defendants' emergency motion for a stay, (Dckt. #249), is denied.

**Date: November 18, 2025**

**Jeffrey I. Cummings**
**United States District Court Judge**